```
 1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF VIRGINIA
 2                  CHARLOTTESVILLE DIVISION

 3   BONUMOSE BIOCHEM, LLC, et al.,    )
                                       )
 4          Plaintiffs,                ) CIVIL NO.: 3:17CV33
        vs.                            )
 5                                     )
     YI-HENG PERCIVAL ZHANG, et al.,   )
 6                                     )
            Defendants.                )
 7                                     )
     _____)
 8
            Transcript of FTR Proceedings - Motions Hearing
 9             Before the Honorable JOEL C. HOPPE
                     January 18, 2019
10                 Charlottesville, Virginia

11   For the Plaintiff:

12       ERIK F. STIDHAM, ESQUIRE
         BRETT C. RUFF, ESQUIRE
13       HOLLAND & HART, LLP
         800 West Main Street, Suite 1750
14       Boise, ID 83702-5974
         202-383-3923
15       efstidham@hollandhart.com
         bcruff@hollandhart.com
16
         JOHN SAMUEL MARTIN, ESQUIRE
17       BRIAN ADAM WRIGHT, ESQUIRE
         HUNTON ANDREWS KURTH LLP
18       Riverfront Plaza, East Tower
         951 E. Byrd Street
19       Richmond, VA 21219
         804-788-8774
20       martinj@huntonak.com
         wrightb@hunton.com
21   _____

22               Mary J. Butenschoen, RPR, CRR
                 210 Franklin Road, S.W., Room 540
23                  Roanoke, Virginia  24011

24                  540-857-5100, Ext. 5312

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
     PRODUCED BY COMPUTER.
```

```
 1    For the Defendant:

 2          JAMES HOPENFELD, ESQUIRE
            DOUGLAS S. TILLEY, ESQUIRE
 3          SINGER BEA LLP
            601 Montgomery Street, Suite 1950
 4          San Francisco, CA 94111
            415-500-6080
 5          jhopenfeld@singerbea.com
            dtilley@singerbea.com
 6
            JOSHUA F.P. LONG, ESQUIRE
 7          WOODS ROGERS PLC
            PO Box 14125
 8          Roanoke, VA 24038-4125
            540-983-7725
 9          jlong@woodsrogers.com

10

11                          *  *  *  *  *

12

13                       INDEX OF WITNESSES

14                            (None)

15

16                          *  *  *  *  *

17

18                       INDEX OF EXHIBITS

19                            (None)

20

21    ///

22

23

24

25
```

1    (Proceedings commenced at 1:06 p.m.)

2              THE COURT:  Hi, this is Joel Hoppe.  Who is on the

3    line for Bonumose?

4              MR. STIDHAM:  You have EriK Stidham at Holland &

5    Hart, Your Honor, and also in the office with me is Brett Ruff

6    of Holland & Hart.

7              MR. MARTIN:  Your Honor, this is Jack Martin of

8    Hunton Andrews Kurth, also for Bonumose.

9              MR. WRIGHT:  Also Brian Wright from Hunton for

10   Bonumose.

11             THE COURT:  All right, good afternoon.  And how

12   about for Professor Zhang and CFB?

13             MR. HOPENFELD:  Hello, Your Honor.  This is James

14   Hopenfeld of Singer Bea.

15             MS. TILLEY:  Doug Tilley of Singer Bea.

16             MR. LONG:  Your Honor, it's Josh Long with Woods

17   Rogers is here as well.

18             THE COURT:  All right.  Good afternoon to you-all as

19   well.

20             Counsel, this hearing is being recorded by the

21   Court's FTR system so there's a record of the hearing.  And

22   we're here on three motions.  There is Professor Zhang's

23   motion to reconsider and also a motion to compel.  And then

24   Bonumose's motion to compel compliance.

25             I want to address Professor Zhang's motion to compel

1    last, and I think we can take up the motion to reconsider and

2    motion to compel compliance basically together.  You know, the

3    subject matter is similar for those.  But I do want to set

4    some parameters on what we're going to discuss for the motion

5    to reconsider and motion to compel compliance.

6          What I intend to discuss on the motion to reconsider

7    is what has been produced at this time and CFB's questions

8    about what needs to be produced in the future and try and

9    address, you know, how that is going to be produced.  But as

10   to the rest of the motion to reconsider, I am going to deny

11   that motion.  I've read all of the things that you-all have

12   submitted on that motion and the other motions and, of course,

13   everything that we've gone through in the past hearings and

14   past briefings.  And, you know, I don't believe that there are

15   any factual or legal errors in that order.  And I know that

16   Professor Zhang and CFB take some issue with some factual

17   findings that I made in that order.  Like I said, I think that

18   there aren't any errors in that order, but, you know, the

19   order -- the purpose of the order at least in part was to set

20   up to require some further exploration of potentially

21   discoverable materials and also at some point to require

22   further explanation, really, from Professor Zhang in a

23   deposition regarding the -- how documents were preserved and

24   how they have been produced over time.  So there's really

25   further information that is -- that's needed on those issues,

1   and that's part of what the order contemplated.  So it really

2   was almost, in that sense, an interim order on really the

3   scope of compliance.  And the order set up some additional

4   requirements for the production of documents.  And I don't

5   think that any of that was incorrect on the law or the facts.

6          So I am going to deny the motion to reconsider.  But

7   I do want to hear more about the scope of production, CFB and

8   Professor Zhang's concerns about proportionality.  I do think

9   that especially considering, you know, the eight terabytes of

10  documents that have been provided that there is some room for

11  discussion about how to -- how to narrow and produce any

12  additional responsive documents under the -- and "responsive"

13  meaning the communications between the defendants and Tianjin

14  regarding Tagatose since January 21, 2015, and discuss further

15  how that production can be made.  And I want to hear more

16  about some of the different categories of documents that have

17  been produced and that have yet to be produced.  I know

18  there's been mention of there are 5200 communications between

19  or with Tianjin that did not specifically reference Tagatose.

20  I want to hear some more about that, and then there are also

21  some WeChat communications as well.

22          So counsel, with those -- with those parameters,

23  Mr. Hopenfeld or Mr. Tilley, do you want to tell me more about

24  the production of discovery concerning these communications?

25              MR. HOPENFELD:  Yes, Your Honor, this is James

1    Hopenfeld, and I will address these issues.  And to do that, I

2    think what might be helpful for the Court is for me to explain

3    exactly what pots of discoverable information there have been

4    and how we've gone about searching and producing documents

5    from them, okay?

6         So the first pot of documents and information was

7    information that was collected by the lawyers pursuant to

8    their investigation of this case before discovery even

9    started.  To my knowledge, all of those documents have been

10   produced, and there's not any issue, to my knowledge, with

11   respect to that production.

12        The next pot of documents has to do with email

13   communications that were made by Professor Zhang with TIIB.

14   Now, some of those communications I believe already were

15   produced in the first pot, but as Your Honor knows, once the

16   Virginia Tech subpoena came back we went back and looked and

17   found that there were additional email communications that we

18   did not believe earlier that we had access to or that we could

19   get, and we were able to access them.  And we spent quite some

20   time going through all of those email communications.

21        Now, I need to explain to Your Honor why there is

22   this additional chunk of email communications.  So Your Honor

23   will recall that when Professor Zhang was arrested and his

24   materials were seized, one of the things that happened is that

25   at least certain of his email accounts were shut down.  In

1    response to that process Professor Zhang created in the course

2    of the criminal proceeding additional email accounts.  Those

3    email accounts that were created -- again, this is post the

4    filing of the lawsuit, post the criminal matter.  Those email

5    accounts were also used to communicate with TIIB.  So we had

6    to go back and search those.

7            So we did a search of those, and what -- as Your

8    Honor might have seen from the briefing, we identified a large

9    volume of communications with TIIB, which isn't surprising

10   because Professor Zhang has been hired by TIIB and he has been

11   in frequent communication with TIIB for several years on many,

12   many, many topics.

13           THE COURT:  Mr. Hopenfeld, are those -- the large

14   number of emails, is that the 5200 that you're referring to or

15   is there something else?

16           MR. HOPENFELD:  Yes.  Yeah, it's the 5200.

17           THE COURT:  And what email -- just to back up a

18   little bit, what email accounts are you talking about?

19           MR. HOPENFELD:  I don't know the precise identity of

20   all the email accounts.  There were several of them.

21   Mr. Tilley, do you know?  I don't even know if you have the

22   exact -- I don't know if we have the exact emails.  We could

23   get a list of them.  We'd certainly be happy to discuss them

24   in deposition or whatever.  There's no -- there's no issue

25   with that.

1          THE COURT:  All right.

2          MR. HOPENFELD:  So again, it's -- there's a chunk --

3  I don't know what percentage of the chunk, but a large chunk

4  of emails are emails that were generated, again, post suit,

5  right?  So -- and those are communications that we searched.

6          Now, when we got Your Honor's order -- and I'm going

7  to get to the WeChat stuff and the other stuff in a minute.

8  But when we got Your Honor's order -- when we got Your Honor's

9  order we went back and looked at that and say, okay, Your

10  Honor has ordered not only that we produce documents that

11  mention Tagatose, but that indirectly refer to Tagatose.  So

12  we went back and looked at the production and tried to see if

13  there was some way that we could reasonably go through all

14  those email communications and identify anything that would be

15  indirectly referred to Tagatose, and the answer is we couldn't

16  do it, and the -- or at least we couldn't do it without

17  spending an extraordinary sum of money.  And the reason is

18  most of those communications are in Chinese.  Many -- I don't

19  know what percentage.  Many of them are on technical matters.

20  And to go through and review all of those and be able to

21  pinpoint which of them are indirectly related to Tagatose

22  without providing an overbroad production would be, Your

23  Honor, a very expensive and time consuming endeavor.  Because

24  to review 5200 communications you need to train up an attorney

25  who speaks Chinese who understands the technology and

1    understands the law.  There are not too many people who can do

2    something like that.  And as hopefully is apparent from our

3    briefing, the odds that there would be anything that's

4    remotely related to this lawsuit in there are exceedingly

5    small.  Because again, these would be documents that don't

6    directly discuss Tagatose, right?  And we've produced

7    everything that discussed Tagatose.

8            THE COURT:  Mr. Hopenfeld, is this -- is your client

9    able to help you with this?  I mean, I think in the abstract

10   what you're saying makes some sense, but, you know, I don't

11   understand why Professor Zhang can't provide some direction

12   and perhaps help you, you know, narrow -- narrow things.

13           MR. HOPENFELD:  I think it would be difficult for

14   him to do that in part because explaining to Professor Zhang

15   how to go through the legality of all of that, including there

16   are privilege issues that would have to be potentially

17   addressed, it would be exceedingly difficult.

18           I mean, could we do that?  We could do it.  I'm not

19   certain -- I'm not certain that will be a productive way to go

20   forward because what's going to happen if you do that is that

21   we'll end up in deposition with him and we'll end up in a big

22   dispute as to whether or not Professor Zhang applied the

23   correct criteria to determine what's indirect, and then

24   there's going to be further motion practicing, we need to see

25   the documents to see if Professor Zhang did the right thing.

1    And the other side has been calling Professor Zhang a liar the

2    whole time.  So the only -- I don't know that that's going to

3    be a productive way to go forward.

4            THE COURT:  Mr. Hopenfeld, I mean, just to be clear,

5    you get Professor Zhang to point you in a direction about, you

6    know, how they are -- where there may be some responsive

7    documents, but I mean ultimately, of course, it's going to

8    fall to the lawyers to make that -- that determination.  But

9    I -- I mean, I would think in the typical course you're going

10   to consult with the client to try and -- try and narrow

11   things.

12           MR. HOPENFELD:  Well, okay, Your Honor.  If we're

13   going to do that, I'll explain to Professor Zhang, whose

14   English skills are not perfect, what is indirectly related to

15   Tagatose, okay?  That is -- that is the difficult problem

16   here.

17           THE COURT:  And indirect -- let me provide just an

18   example for you.  You know, I don't have the documents and,

19   you know, I haven't been looking through those like you-all

20   have been in this case.  But, you know, I could see where

21   there is one communication where it is -- you know, it's

22   pretty clear that -- or Tagatose is specifically referred to

23   and if the communication is with Tianjin and Professor Zhang

24   within the time period.  And then there's a follow-up

25   communication the next day or something that is, you know,

1    talking directly -- and it refers to the previous

2    communication, but maybe it doesn't use the word "Tagatose",

3    but it's clear that the subject matter is, you know, referring

4    back to Tagatose and it is potentially relevant.  That's where

5    I can see indirect.

6         I understand it may be a challenge to -- you know,

7    to try and locate that information, but -- but I think it

8    would cover relevant information.

9         MR. HOPENFELD:  Your Honor, what we could do -- so

10   we have already produced all of the communications that

11   mention Tagatose.  What we could do is -- and I don't know

12   what this would entail, and I'd be more than willing to do

13   this if this is -- Your Honor thinks it would be helpful.  I

14   can go back and see if there were additional emails in that

15   trail.

16        So for example, if there's a document that mentions

17   Tagatose, we can go and follow up and see if there are

18   additional emails in that trail that don't.  I think we could

19   do something like that.  But that is not the same as reviewing

20   all 5200 communications in terms of the scope of the project.

21        Is that something Your Honor is contemplating?

22        THE COURT:  You know, I think that -- I think the

23   step that you proposed, you know, would be one that you would

24   need to take.  You know, on the reviewing all 5200, you know,

25   I do stand by what I said, you know, many months ago in that

1    it's not -- you know, it's not every communication that Zhang

2    had with Tianjin.  It's -- you know, there's got to be some

3    relation to Tagatose.  And I -- you know, from where I'm

4    sitting, I don't know how without having looked at the

5    documents, talked with Professor Zhang, having that kind of

6    intimate knowledge of the case, how I could further narrow the

7    directions that I've provided to you.

8              MR. HOPENFELD:  All right.  Well, Your Honor, I

9    mean -- I mean, if I go back and I tell Professor Zhang we've

10   got to review -- I mean, there are different ways I can

11   propose this if what you want us to do is have Professor Zhang

12   do this work.

13             If I go back to Professor Zhang and say, hey --

14   well, there's one way.  The first way is the way I proposed

15   where we can just do email chains.  And I can't tell you

16   whether or not that would even be a fruitful way until we see

17   what that pulls up, right?  Because I don't know to what

18   extent the email chains are interrelated.

19             With respect to having Professor Zhang review all

20   5200, that's going to be a very time consuming exercise.

21   Again, I'm not sure that it's fruitful, but if that's what

22   Your Honor orders we'll comply with it.

23             THE COURT:  Mr. Hopenfeld, I'm not saying that

24   Professor Zhang has to review 52 -- these 5200 emails, but,

25   you know, in looking at some emails, or if there are some that

1    are clearly related to Tagatose, you know, I would think that

2    he could provide you some direction about, you know, time or

3    content or something that would provide some direction about

4    where you all should be looking for -- for relevant documents.

5    I mean, if he can't provide that, he can't, but I think that

6    that's at least somewhere to -- somewhere to start.

7            But I think that your suggestion about following up

8    on the email chains and -- that that is something that -- you

9    know, that you should be doing and I think that's a helpful

10   way to approach it.

11           MR. HOPENFELD:  Yeah.  Now, Your Honor, there's --

12   you know, I don't know -- again, the time scale of the 5200

13   communications, I can't tell you exactly what it is.  I can

14   tell you that the request, I believe, dates back to I think

15   it's 2015, okay?  So with respect to Tagatose, okay, if we're

16   going to just go -- I don't believe that there -- I mean, we

17   do produce a number of documents.  I don't believe that

18   there's this -- especially early on -- well, I guess it

19   depends on what you mean by -- excuse me, let me start over,

20   because it's going to be -- I don't want to confuse the Court.

21           So with respect to what is a Tagatose communication,

22   we -- again, we can only go right now by what the document

23   identifies as Tagatose.  So what we can do is -- I don't know

24   how many of those email chains there are.  We can go back and

25   see if it's seizable to go back and do the step that I'm

1   saying.  I'm willing to do that.  What I can't -- what I don't
2   want to promise Your Honor is that it's necessarily going to
3   be a fruitful step, that I don't know it's going to yield any
4   additional documents.  You know, I don't know -- I don't know
5   what it's going to do for us here in this case.  I don't know
6   whether it's going to give us information that's truly
7   proportional, but, like I said, if that's what Your Honor
8   wants us to do, that we will do.

9          THE COURT:  It seems like -- it seems like it would
10  fall within your responsibility to make a reasonable effort to
11  produce responsive documents to -- to include that as part of
12  your search.

13         MR. HOPENFELD:  Okay.  So I just want to make sure I
14  understand here.  We will go back and we will -- we don't have
15  to review all the 5200 documents, but we will go back and
16  check to see whether of the Tagatose documents we have,
17  whether there's additional emails in the chain that don't
18  expressly refer to Tagatose but refer to another email that
19  does refer to Tagatose.

20         THE COURT:  I think that is -- Mr. Hopenfeld, I
21  think that's one part of it.  You know, I -- without the
22  benefit of an explanation from your client about what
23  communications he may or may not have been having with TIIB
24  concerning Tagatose during this period, you know, I'm not
25  going to get -- I'm not going to artificially limit, you know,

1    the responsibility to inquire into -- into these 5200

2    documents.

3           Now, I'm sure that there are some that are -- and

4    perhaps most if not all of those documents are -- well, I'm

5    sure there are some that are not responsive in there.  There

6    may be some that are, though.  And, you know, you-all have the

7    key with Professor Zhang to try and figure out where

8    responsive documents may be.

9           Now, I think he can provide you some direction, but,

10   you know, I don't know what he would say.  So I -- you know,

11   I'm not going to just limit what could be responsive -- you

12   know, your duty to look into potentially responsive documents

13   without having further information.

14          MR. HOPENFELD:  Your Honor, I understand that.  But

15   what time trying to prevent is further motion practice.

16   Because what's going to happen here -- look, hopefully the

17   criminal case will be resolved soon.  I don't know.  But once

18   it's resolved, we're going to put Professor Zhang up for his

19   custodial deposition, and they can ask questions about all --

20   about these communications.  So -- and to the extent that they

21   are not privileged, which I think in many cases they will not

22   be, at least for the ones that I'm contemplating, Professor

23   Zhang will give his best possible answers to that.

24          Where I don't want to be is in a situation that no

25   matter what Percival says we're going to be back here with the

1    Court saying, okay, we've got to go now back through these,

2    you know, 5200 documents again.  I just don't want -- I'm

3    trying to see if we can come up with some way that we can

4    resolve this issue before we go into the deposition so that

5    they have a fair scope of what they need to cross examine

6    Percival and ask him the right questions and that what we

7    don't have is deposition of Percival, more motion practice,

8    coming back here, get more depositions of Percival.  Discovery

9    will never end that way.

10           So I'm -- I'm trying to compartmentalize this and

11   just, you know, get -- do something reasonable and

12   proportional.

13           MR. TILLEY:  Your Honor, this is Doug Tilley from

14   Singer Bea.  If I can jump in, I mean, I echo Mr. Hopenfeld's

15   concerns that without some clear sort of parameters what we're

16   doing is just road kicking the can down the road and there's

17   going to be another dispute about it.  And I am sympathetic to

18   Your Honor's concern, which makes total sense, that you don't

19   know -- you know, you're not close enough to the documents.

20   You don't know the things that we and Bonumose have access to

21   so you can't do that in a vacuum.

22           I wonder whether it would be productive for us to

23   try to engage with counsel for Bonumose in a way that we might

24   be able to set some guidelines and some sort of, you know,

25   bumpers on the lane so we all have agreement prospectively on

1    what needs to be done, and then we will go -- to the extent we
2    have disputes we can bring them back to you and resolve them,
3    which will be easier and less burdensome than doing the review
4    that we think is right, having Bonumose object to it, and then
5    we're back on full-blown motion practice.

6          So this is a long and inarticulate way of saying
7    perhaps we seek to work with counsel prospectively to identify
8    a fair and reasonable and proportional protocol for
9    identifying what's potentially relevant, we go and we execute
10   on that.  That to me seems like a more orderly and less sort
11   of landmine ridden approach to dealing with what is a pretty
12   thorny issue.  Does that make sense?

13         THE COURT:  I think that certainly does make sense
14   for you-all to talk further about this.  I think that the two
15   things that I've said and that Mr. Hopenfeld, I agreed with
16   your suggestion about following these -- you know, the email
17   trails.  And then the other one to be for you-all to try and
18   get some further direction from the client.  And I think that
19   when you have that it may be easier to have that discussion
20   with counsel for Bonumose about the, you know, further
21   guidelines to look into the 5200 emails.

22         Now, let me hear from counsel for Bonumose just on
23   the 5200 emails and what your thoughts are on that.

24         MR. STIDHAM:  This is Erik Stidham, Your Honor.  We
25   have -- I need to back up.  And reign me in, Your Honor, if

1    I'm going beyond the way you're asking me to address here, but

2    I think this does go to the 5200 emails.  But I want to back

3    up a step because I believe what we really are starting to go

4    down the road is with a false definition of what's responsive.

5            We're all aware that the Court did provide us some

6    guidance, you know, regarding Tagatose way back when and that

7    there needed to be a connection with Tagatose.  But that

8    related to a relatively specific interrogatory.  And I know

9    that the Court's last order, of course, was focused on

10   Tagatose and indirectly related to Tagatose.

11           But one thing I want to make sure, from our

12   perspective and one of the concerns we had with the motion,

13   particularly how it was framed, is there -- there is -- and I

14   think it's playing out in this discussion, an effort to

15   redefine the discovery in this case as being just about

16   Tagatose.

17           And first, Your Honor, in regard to indirectly

18   relating to Tagatose, I would remind -- I would remind us all

19   that part of what was being discussed with the Court thereto

20   and referenced was that this is not just a case about the --

21   you know, what we've called the copycat patent relating to

22   Tagatose.  It relates to a breach of Professor Zhang and CFB's

23   responsibilities relating to (inaudible) and regarding

24   assigned assets.  And in the briefing here, Your Honor, we did

25   cite and remind the parties that not only is it Tagatose but

1    the assigned assets are broader than that.  They include

2    fructose and others and are broadly, I think, considered sugar

3    phosphates.

4            So if we're talking about kind of the category of

5    issues here, Your Honor, to us and what we understood and

6    what -- at the risk of overstepping and making assumptions

7    regarding what the Court had in its mind at the relevant time,

8    the context that led to that order was a discussion of

9    assigned assets and sugar phosphates.  So it's not just the

10   obvious which has been discussed now about if you read an

11   email stripping, and we all have relatively and other devices

12   that allow one to review documents relatively efficiency by

13   getting the documents that are connected to see where the

14   strings lead.  That function I think, Your Honor, to be blunt,

15   is a no-brainer that should have been done long ago to find

16   emails that are indirectly connected in that way.  Indirectly

17   relating to Tagatose should include sugar phosphates and what

18   is defined between the parties as in that broad category.  And

19   that's -- that has been a stumbling block -- "stumbling block"

20   is actually the wrong word.  That has been our objection all

21   along to the efforts to define this solely by doing a word

22   search for the Chinese term Tagatose or the American -- excuse

23   me, the English term for Tagatose.

24           And then related to that, Your Honor, which it goes

25   to our concerns about how this is being defined and what I had

1    in mind when I said trying to boil down all the discovery to

2    single question of Tagatose is remind the parties that this

3    case involves more broadly than just Tagatose the relationship

4    that exists between Professor Zhang and TIIB.  And I hear and

5    we have had heard complaints that, you know, that doesn't mean

6    that every single touch point between TIIB and Professor Zhang

7    is relevant to this, but it certainly means -- and this is a

8    concern that I think there's an effort to try and box this

9    category of information out.  It certainly would include the

10   contractual relationship that Professor Zhang has at the time,

11   the interactions he's having with TIIB relating to his --

12   Professor Zhang's -- both financial incentives and directives

13   to generate new innovations relating to sugar phosphate that

14   were occurring at around the time of the relevant context.

15            And that's why, Your Honor, referenced in some of

16   the briefing that is before the Court and in the affidavit, we

17   included that document -- document that was found as part of

18   the -- as part of the Virginia Tech production which showed --

19   and this didn't relate to Tagatose, but this would fall in the

20   type of category that we want to make sure gets swept in.  It

21   showed Tianjin sending to Professor Zhang some documentation

22   relating to a sugar phosphate-based invention or innovation

23   and having him fill out forms as relating to being an

24   undisclosed inventor on a patent.

25            I mean, Your Honor, that clearly shows -- that's

1    clearly what we think might have been what we clearly believe

2    was involved in the copycat patent, and it's clearly relevant

3    to the nature and type of relationship and procedures that

4    Professor Zhang was involved in.  But it certainly would not

5    be pulled in with regard to just a word search for Tagatose.

6            And then to add one more component to this

7    indirectly related, Your Honor, and I know we're going to talk

8    about the motion to -- for sanctions against I think me and

9    the firm relating to what was disclosed to law enforcement.

10   But the reason I raise that as it relates to what's at issue

11   relating to Tagatose is, Your Honor, they have asserted and --

12   although we've been successful on some motion practice to

13   delete some counterclaims and some affirmative defenses, as I

14   understand it, and as is reflected in this motion to compel or

15   ask for sanctions regarding law enforcement, the defendants

16   are still contending and plan to raise at trial that

17   Mr. Rogers and Bonumose and others were falsely raising issues

18   relating to the relationship that existed between Zhang and

19   TIIB and other things in order to generate -- they say to

20   interfere with the relationship with the NSF and generate the

21   legal claims.

22            So, Your Honor, what we have now relating directly

23   to this affirmative defense that we understand that they are

24   still asserting is they are bringing the issue as to what the

25   true nature of his relationship with TIIB was and how that

1    relates to Ed Rogers raising issues to the NSF.  Because it

2    was a component in the criminal trial that he had failed to

3    disclose his relationship with TIIB.  That was an allegation

4    in the criminal trial.  It was a finding in the audit by

5    Virginia Tech that he failed to disclose -- properly disclose

6    his relationship with TIIB and it was a concern raised by

7    Mr. Rogers in his whistleblowing.  So the nature of his

8    relationship with TIIB at least relevant to what they contend

9    of false allegations is stuck in this case, too.

10           So, Your Honor, I apologize if I -- for going on as

11   long as I can, but I just think that it's very important and a

12   significant concern for us that we keep in mind that this

13   is -- there is proper discovery that is broad against TIIB.

14   Now, do we want every single -- we don't want emails that

15   reflect, you know, Mr. Zhang asking another professor at TIIB

16   out to lunch for something like that.  That's part of why

17   we're upset by the document dump.  But what we do think is

18   that they properly bear the burden of doing a thoughtful

19   review of documents, the documents and information they do

20   have, to address these types of categories of information.

21   They cannot be avoided by trying to push a ruling -- push a

22   ruling from this Court that is somehow circled solely around

23   the definition of Tagatose.  And so that's -- that's something

24   I think that needs to be addressed and understood at the

25   outset, that this effort to redefine everything based on --

1    and supposed confusion regarding what's being called for is --

2    needs to be rejected.

3            And Your Honor -- I mean, this litigation does, we

4    believe, have significant financial consequences for Bonumose.

5    And just by a frame of reference, and I'm going off memory, we

6    have incurred hundreds of thousands of dollars in discovery

7    costs and counting -- including teams of paralegals and others

8    reviewing the documents we've produced. It is -- it is a

9    burden that is unfortunate, but it's a reality. We incurred

10   that and did our best. Certainly I'm sure there's some

11   imperfections there, but we did our best and incurred those

12   kinds of costs in responding. And we're welcome to get -- we

13   think that we have engaged in very good faith to find these.

14            And, Your Honor, I'll just sum up and say that scope

15   that I just kind of ran through is what we believe properly

16   was included or contemplated by the Court with Tagatose or

17   indirectly related to it in the context of this case.

18            THE COURT: All right. Mr. Hopenfeld, what's your

19   view on the contractual relationships, financial incentives,

20   and communications concerning that with Tianjin and Mr. Zhang?

21            MR. HOPENFELD: Okay. Your Honor, what you've just

22   heard from Bonumose's counsel is an entirely new theory of the

23   case, and it's not in their complaint. Okay. Their complaint

24   alleges one count of breach of contract, and that breach of

25   contract is essentially breach of the noncompete with respect

1     to the issue of Tagatose.  Their allegation is -- which is

2     false, and we can prove it's false -- that Professor Zhang

3     disclosed the contents of a patent application to TIIB and

4     that in doing so he was in breach of his noncompete

5     obligations and other obligations under that contract.

6     There's nothing in the complaint about sugar phosphate.  This

7     is the first time we've ever heard from counsel that sugar

8     phosphates are in the case, and it shouldn't be in the case.

9     It's not proper.

10          And let me tell you what's really going on here,

11    because there's a reason why Bonumose wants to get at

12    documents that have nothing to do with Tagatose, and I'm going

13    to explain that right now.  Your Honor might recall --

14          THE COURT:  Mr. Hopenfeld, link this in with -- you

15    know, with the assigned assets, too, and how they are --

16          MR. HOPENFELD:  Yes.  So let me explain.  So the

17    assigned assets include any trade secrets relating to

18    Tagatose, and there were a couple other things.  Sugar

19    phosphates is one of them.  They are listed in the assigned

20    assets.  But there has been until now no dispute that

21    Professor Zhang has done anything wrong with respect to sugar

22    phosphates, that there was any trade secret information or any

23    of that or anything breached with respect to sugar phosphates.

24    And there's a whole separate -- there were -- some of the

25    issues at the criminal trial related to grant applications

1    that related to sugar phosphates.  But until now we've never

2    heard any of that being a part of the case.  So I'm, quite

3    frankly, a little bewildered by the allegation here because

4    there's never been an allegation about it.

5             Now in -- also in that same agreement there's a list

6    of assets that were considered to be disputed assets.  One of

7    the disputed assets you might recall to be Inositol, okay?

8             Now way back earlier in the spring and the early

9    summer you might recall that we went back to Your Honor to

10   say, hey, you know, we object to document production that's

11   overly broad beyond the allegations here which relate to

12   Tagatose.  Again, nobody mentioned anything about sugar

13   phosphates at the time and, in particular, the issue with

14   respect to Inositol, because the plaintiffs wanted to

15   characterize their dispute more broadly and they wanted any

16   type of -- any type of information regardless of Tagatose,

17   Inositol, whatever.  And Your Honor ruled, and we believe

18   correctly, that the Inositol isn't part of this and that to

19   the extent that we go back and search the documents it's going

20   to be limited to stuff that is in the complaint.  The

21   allegations related to Tagatose or something related to

22   Tagatose.  Nobody has ever said -- we've never heard that

23   sugar phosphates is related to Tagatose.  It is not.

24   Indirectly or otherwise, okay?

25             So that was the state of the universe, okay?  We

1    actually -- to test Bonumose, we sent them an interrogatory

2    saying -- asking about Inositol.  And their response to the

3    interrogatory on Inositol was that Inositol is not relevant to

4    this case.  Okay?

5            However, we have learned just in the last few weeks

6    that what plaintiff has done is they have gone to Virginia

7    Tech and they have gotten Virginia Tech to give them an

8    assignment of inchoate rights, meaning -- it's like a quick

9    claim deed.  It's like we'll give you whatever rights we have,

10   but we don't say we have any, and those rights are to

11   Inositol.  That assignment was taken by Bonumose's lawyers,

12   and their lawyers contacted lawyers for -- for CFB, and their

13   lawyers said we now own the rights to Inositol and we want to

14   have direct -- we want to have direct contact with Chengdu,

15   which is a University in China.

16           Now let me explain here, Your Honor, because

17   there -- here -- let me explain how this connects to this

18   case.  So Your Honor will recall that Professor Zhang is

19   accused of giving trade secret information to TIIB and that he

20   has a relationship with TIIB.  And it's public information

21   that TIIB was obtained through the efforts of Professor Zhang

22   and collaborators in China, when they were in China, a patent

23   on Inositol which was assigned to TIIB and then assigned to

24   Chengdu.

25           That -- there are additional intellectual property

1    rights in the U.S. that now -- actually, all of these rights

2    are now claimed -- Bonumose claims to own them and they have

3    gone back to -- to us demanding an opportunity for Ed Rogers

4    to meet with the Chinese, with Chengdu, and basically

5    essentially threatening them with -- with -- with legal action

6    to take the property and obtain the rights to Inositol.  Now,

7    what's really going on there is they are trying to cut off the

8    funds for this lawsuit.  So they are trying to threaten using

9    Inositol.

10           Now, how do we know that this litigation is

11   involved?  We just got a whole bunch of subpoenas from

12   Bonumose to our counsel and other people.  In most of those

13   subpoenas there was an item specifically requesting

14   information from Inositol.

15           So what's going on here, Your Honor, is that we --

16   what we're seeing is that they want the nonTagatose-related

17   stuff, whether it be sugar phosphates -- but especially the

18   Inositol, that's what they are really after, because they are

19   trying to use this additional information to get leverage to

20   cut off the only source of funding that CFB and Professor

21   Zhang have to continue to litigate this case.  That's what's

22   going on here.  That's why they want that additional

23   discovery.  It has nothing to do with the merits of this case.

24   Has nothing to do with the complaint whatsoever.  Has nothing

25   to do with any dispute over the April 1, 2016, agreement.

1    Nothing.

2            MR. TILLEY:  I want to -- I'm sorry to interrupt.

3    This is Doug Tilley.  I want to highlight and address a few

4    points that Mr. Stidham made.

5            One, the interrogatory that we were speaking about

6    back in July where Your Honor said that, you know, any

7    discovery and communications with TIIB needed to be tied to

8    Tagatose, that interrogatory was tell me about all

9    communications you had with TIIB period.  And were it true, as

10   Mr. Stidham suggests, that communications regarding sugar

11   phosphates or Inositol or any compound other than Tagatose

12   were in fact relevant, those arguments would have been

13   presented at that time.  They were not.  Rather, we talked

14   about Tagatose.

15           And further, to echo Mr. Hopenfeld's point, I just

16   took a look back at the complaint.  And while the phrase

17   "sugar phosphates" does appear because it's, you know, part of

18   a block quote from the agreement that gave rise to this suit,

19   that is not the subject of any claim.  And it's not because

20   Bonumose, you know, hasn't had an opportunity to amend its

21   complaint.  It's amended its complaint twice, including most

22   recently in September.  So it is in my mind beyond dispute

23   that this case is fairly limited to Tagatose, and this theory

24   that new compounds and different scientific technologies, that

25   that is somehow relevant, is -- is a fabrication that is

1    intended to further exactly what Mr. Hopenfeld is talking
2    about, which is blocking, you know, TIIB from continuing to
3    advance money that belongs to Percival.  This is not TIIB's
4    money.  TIIB is not funding this litigation.  I cannot stress
5    that hard -- enough.  They are advancing money --
6                MR. HOPENFELD:  Thank you, Doug, because I wanted to
7    explain that to the Court, too.
8                MR. TILLEY:  Yeah, cool.  It's money that is due and
9    owing to Percival.  So any other mischaracterization is just
10   that, and it's -- it's getting a little bit difficult to keep
11   listening to.
12               MR. HOPENFELD:  Your Honor, let me just sum this
13   up.
14               THE COURT:  Hold on.  But you-all would agree that
15   communications regarding contractual relationships or
16   financial incentives that Mr. -- Professor Zhang had with
17   Tianjin as it relates, you know, to Tagatose, that that is
18   discoverable.
19               MR. HOPENFELD:  As it relates to Tagatose, Your
20   Honor, we have not disputed that.  What they are interested in
21   is the other financial arrangements relating to Inositol.
22   That's what they are interested in.  And they said -- the
23   reason they are interested in it, again, is to get leverage
24   over to see if they can, A, acquire -- use it to see if they
25   can threaten TIIB to get the Inositol rights for them.  But

1    more importantly, my understanding is that what they really

2    want to do is that they want to use that as leverage to try to

3    threaten TIIB to cut off the funds that they have been

4    advancing Professor Zhang so that he can continue to fight

5    these allegations.

6           THE COURT:  Mr. Stidham, have we been talking about

7    Inositol in all these past hearings?  I know I've read it in

8    various documents, but I feel like the conversations we've

9    been having, that we have been talking about -- about

10   Tagatose.

11          MR. STIDHAM:  So, Your Honor, a couple things.  We

12   have touched on Inositol at times.  Mr. Tilley I think was

13   referring to -- and this is what I think is just not an

14   appropriate -- I think they are basically trying to use your

15   words against you in a way that I don't think is fair.

16          Mr. Tilley is referring to -- with regard to that

17   interrogatory response is that for lack of a better term, Your

18   Honor, that baton death march of a meet and confer we had that

19   was about four, four and a half hours long.  And at the end of

20   that we did -- we were trying to get our hands around the

21   scope.  And Inositol was -- was mentioned.  And Your Honor,

22   you did say that you wanted it to be focused more on Tagatose.

23   But I think it's -- it's wrong to read that as some

24   limitation, an exclusion of Inositol at that time.  It was a

25   discussion for the parties to frame things.

1          So, Your Honor, to go to your question, though,

2    about when has Inositol been discussed or not, first, it's a

3    misrepresentation of the current complaint to say that we are

4    not seeking claims, have not asserted claims, regarding the

5    assigned assets.  It's clearly stated in the second breach of

6    contract claim and another claim, and Inositol is specifically

7    mentioned in paragraph 49 and another paragraph there.

8          And there's two issues with regard -- and so, Your

9    Honor, we have touched on Inositol, but it is fair to say that

10   Tagatose has always been the focus.  My point is, as I said at

11   the outset, that what we're very concerned about is that the

12   motion that was brought and this discussion about trying to

13   frame it just as Tagatose is, one, not addressing the way the

14   complaint certainly is drafted now and I think always should

15   have been contemplated as being drafted.  And then two, what

16   you didn't hear addressed was the issue that's created by this

17   assertion that they interject into the case that Ed Rogers

18   somehow acted wrongfully.  Because Ed Rogers raised issues

19   regarding Inositol and Professor Zhang's dealings with Tianjin

20   relating to that.  And that investigation regarding Inositol

21   is all swept up into this assertion in their affirmative

22   defense that Ed Rogers made false claims or false

23   representations.

24          So they are saying Ed Rogers made false

25   representations relating to Zhang dealings regarding Inositol

1   with Tianjin, but they don't want to let any discovery be held

2   regarding what Zhang's actual relationship with Inositol was.

3   And so Inositol is in their affirmative defenses and it is

4   addressed in our affirmative claims.

5           And Your Honor, Inositol is not -- I want to make

6   this clear.  Inositol, though, is not one of the assigned

7   assets.  The other broader definition of sugar phosphates is

8   not -- does not include Inositol, but it does -- is included

9   in the breach.

10          So Your Honor, I -- Inositol, to sum up and

11  hopefully respond to your question in a -- kind of summarize

12  what I said before in a way that's responsive to your

13  question, Inositol has been mentioned in the past.  It was

14  mentioned in the context some time ago late in that

15  discussion, but I don't think -- we certainly don't believe

16  the Court -- we didn't understand the Court to have ruled

17  definitively that nothing relating to Inositol is relevant

18  and/or that only the words "Tagatose" are relevant regarding

19  any of this.

20          And I would also say, Your Honor, that the fact --

21  what we've heard mention of here is that there are contractual

22  relationships and dealings relating to Inositol that Professor

23  Zhang engaged in with TIIB that not only go to the supposed

24  misrepresentations -- excuse me -- that actually defeat the

25  contention that Mr. Rogers raised illegitimate questions

1    regarding Zhang's relationship with TIIB regarding Inositol,
2    but they also flow into what the nature of Zhang's
3    relationship with TIIB was and how he had financial incentives
4    to be taking technology that was developed in Virginia Tech
5    and having it commercialized through TIIB.  And I won't go
6    through the whole thing, Your Honor, but it is true that
7    Virginia Tech has assigned -- Virginia Tech and VTIP in
8    particular, as I think the Court knows, has an ownership
9    interest in Bonumose.  And Virginia Tech -- and Virginia Tech
10   can explain why it did so.  Virginia Tech certainly believes
11   that professor -- has given an indication that Professor Zhang
12   has acted in a way that's contrary to his representations to
13   them regarding their ownership in Inositol, and they have
14   transferred it to Bonumose.  We're not bashful about that.

15          But we're not doing anything illegitimate in any
16   aspect of the litigation.  And I know the Court is trying to
17   frame this, so I'm -- keep us within bumpers.  But there was
18   an assertion about wrongful discovery.  There's an issue here,
19   Your Honor, we have sent discovery out to try and get the
20   lawyers who are involved in the underlying transaction to
21   provide us their documents.  And unfortunately, one or two of
22   them likely are going to be witnesses.

23          And where that's relevant, Your Honor, just because
24   I don't want you to think we're playing games here, I know
25   that you need to be -- all parties need to be thoughtful

1    before they are deposing other counsel.  But there's an issue

2    here as to what was represented or not represented relating to

3    the transaction, and Professor Zhang is contending that he was

4    somehow defrauded while he was represented by legal counsel

5    relating to these transactions.

6           So that's -- that's what's going on there, Your

7    Honor.  There's no illegitimate effort regarding anything.

8    It's a misrepresentation to say the assigned assets are not

9    implicated or a part of the contract.  There's no reasonable

10   way that a party could have assumed that that was not an issue

11   in this case.

12          So that's our position, Your Honor.  Hopefully that

13   responded to your question.

14          MR. HOPENFELD:  Your Honor, may I respond to that,

15   please?

16          THE COURT:  Yeah, and then I think we need to wrap

17   up this point.

18          MR. HOPENFELD:  Okay.  So, Your Honor, I would

19   invite you to read the complaint and defenses, and I think you

20   will -- I think it's -- it's very apparent from a plain

21   reading of that complaint that what's alleged there has to do

22   with Tagatose and nothing else.

23          With respect to Inositol, I'd like to remind Your

24   Honor that again we sent interrogatory to Bonumose and they

25   denied.  They specifically said Inositol is not relevant to

1    this case.

2          And I also invite the Court to go back and revisit

3    the rulings it made with respect to the overbroad discovery

4    question that we specifically said, look, we don't want to

5    provide the Inositol stuff because this is -- I mean, that's

6    part -- it's the classic fishing expedition.  That's what it

7    is.  We want to focus this case and the discovery in a way

8    that's proportional.  And the way to do that is to focus on

9    the allegations that are here, that are Tagatose.

10         Now, we also heard that somehow Professor Zhang's

11   communications with TIIB are relevant to our defenses about Ed

12   Rogers.  I just -- that connection is -- it just doesn't make

13   any sense.  What we have said in our defenses, it is true --

14   it is true -- is that Ed Rogers used undue influence by making

15   false statements to law enforcement authorities in order to

16   get leverage in order to acquire the intellectual property

17   rights.  The conduct that is in question is entirely that of

18   Ed Rogers.  Our defense depends on what Ed Rogers did, why he

19   did it, and how he did it.  Percival Zhang's communications

20   with TIIB on matters having nothing to do with Tagatose and

21   have nothing to do with that defense and it has nothing to do

22   with any of the claims that are in the complaint for which

23   there would be a Rule 11 basis for allegation.  And what we're

24   hearing now is that -- is that really what you're hearing is

25   that they realize, and probably have realized long ago, that

1    there's no basis to their Tagatose allegations, and they are

2    seeking a way to expand this case in order to keep it alive

3    somehow.  Because what their real objective is, is to bankrupt

4    Percival Zhang and CFB.

5            Your Honor, you probably have inferred by now CFB

6    doesn't have any money.  Percival Zhang has been rendered

7    destitute by the criminal case and this case.  He's got

8    nothing.  The only thing that's keeping this case alive is the

9    fact that TIIB is advancing him money.  Again, they are not

10   paying for the lawsuit.  There's no unlimited budget.  They

11   are literally advancing him the money to defend himself so

12   that he can defend his name.  That's what this is about.

13   Okay?

14           And -- and -- and just to give you another data

15   point, you might recall on the very first time we had an oral

16   argument in the court it was on a motion to dismiss.  And I

17   got up and explained to Your Honor that Bonumose had a strong

18   incentive to make these allegations and false allegations of

19   misappropriation in order to avoid the breach of contract

20   problem that they had because they didn't meet their

21   milestones, and they didn't.  And by not meeting their

22   milestones they'd have to give intellectual property back.

23           Now, what Ed Rogers had calculated, he had

24   calculated -- he knew because he had been a former director at

25   CFB, former CEO.  He knew CFB had no money and he knew

1    Percival Zhang had no money.  So he thought if he sued them,

2    he thought if he sued them they would fold because that

3    Percival didn't have any money, okay?  What he didn't

4    calculate on, he didn't calculate on, is that TIIB would throw

5    Professor Zhang a lifeline so that he could defend his name.

6          After that motion to dismiss hearing while I was --

7    as soon as Your Honor left the Court, Ed Rogers came up to me

8    and said, are you being paid in yuan?  That is, are you being

9    paid in Chinese currency.  I refused to answer and he asked me

10   again.  He was very upset.  Very upset that somebody was

11   paying for Percival Zhang's defense.  And what his strategy

12   has been and continues to be with every single one of those

13   motions is simply impose as many costs on Percival Zhang and

14   the people who are funding him as possible.

15         Now, Your Honor, I don't make those allegations

16   lightly.  I invite Your Honor to review the record and see in

17   every instance what they are asking this case -- Your Honor to

18   do.  They are asking Your Honor to broaden discovery in ways

19   that are far beyond the scope of the complaint.  They are

20   asking Your Honor to order CFB and Professor Zhang to conduct

21   burdensome activities, some of which we haven't even discussed

22   yet, that have literally zero -- I mean, 0.001 potential to

23   have anything relevant in this case.

24         What's that about?  That's about literally trying to

25   bankrupt Professor Zhang and they are trying to cut off his

 1    funds, and that's why they are using this case as a fishing
 2    expedition.  I do not make those allegations lightly, but they
 3    are true because that is what is happening.  You don't respond
 4    to an interrogatory response in Inositol and say it's not
 5    relevant.  And after having heard the Court say hey, look,
 6    let's conduct everything (inaudible) Tagatose and then you go
 7    out and subpoena a bunch of parties on Inositol specifically,
 8    a bunch of lawyers.  And then you come up in the case and say,
 9    oh, this isn't a Tagatose case anymore, it's about sugar
10    phosphate.  We never even heard about that.
11              THE COURT:  All right.
12              MR. HOPENFELD:  Your Honor, I think that tells you
13    something about what's going on here.
14              THE COURT:  Well, here's what I want to -- want to
15    do on this.  This is obviously an important point about the
16    scope of discovery and the scope of the allegations and
17    defenses in the case.  And it really wasn't something that was
18    fairly or clearly raised in the briefing for any of the
19    motions that we're having today, so I want to consider that
20    more.  I want to do so carefully.  And I want some further
21    input from you-all on that, and specifically what I want is
22    just some briefing on -- you know, directing me to what
23    you-all think is the scope of the existing claims and asserted
24    defenses in the case and if those concern Tagatose assigned
25    assets, sugar phosphate, Inositol, you know, within that realm

1    of information.  I want you to walk me through.  And if
2    there's some discovery responses that you think limit those or
3    further flesh them out, then please provide those as well.
4    And yeah, I would like to see that, and I think limiting the
5    responses -- or submissions to ten pages.  If you need to
6    attach exhibits, which I think you probably would, of course
7    you can go beyond the ten, and to have that by next Friday.
8              MR. HOPENFELD:  So Your Honor, I just want to make
9    sure I'm clear.  Both parties are going to make independent
10   submissions.
11             THE COURT:  Right.
12             MR. HOPENFELD:  Next Friday on what they think is
13   and is not within the scope of the case and proper discovery.
14             THE COURT:  Right.  On this related -- and where
15   this is coming -- coming out of is, you know, it's -- you
16   know, the communications concerning or related to or
17   indirectly relating to Tagatose, is that -- you know, is that
18   overly narrow, is it overly broad?  It seems like you-all have
19   pretty differing views on that at this point.  I want to make
20   sure that -- that we're real clear on it.
21             MR. HOPENFELD:  Okay.
22             THE COURT:  All right.
23             Okay.  I know there are -- Mr. Hopenfeld, there are
24   some other categories of documents that you provided.  There
25   are 88,000 documents that were provided that I think were

1    related to -- to the communications.  Is that right?  Can you

2    tell me more about that?

3              MR. HOPENFELD:  I don't know that the number is

4    88,000.  I did see that number in their papers.  Doug, do you

5    know that we actually got a -- did we actually get a document

6    count on that?

7              MR. TILLEY:  It's a page number, not a document

8    count, and that was -- that production included any -- any

9    document and any attachment sent to or from any known

10   TIIB-issued or nonTIIB-issued point of contact for

11   TIIB-affiliated personnel that referenced -- that made

12   reference to Tagatose.  It was -- that -- that is everything

13   we have that references Tagatose that's within our possession,

14   custody, and control.

15             THE COURT:  Okay.

16             MR. HOPENFELD:  And just to remind Your Honor,

17   that's the second pot of documents.  There's two more pots we

18   haven't even talked about.

19             THE COURT:  Right.  And there was -- and then also

20   some WeChat --

21             MR. HOPENFELD:  Yes.

22             THE COURT:  -- documents that -- tell me more about

23   that.

24             MR. HOPENFELD:  Yeah.  So Your Honor, we -- as Your

25   Honor ordered, we hired a discovery vendor to go and see if we

1    could recover the WeChat information.  And you will see

2    actually we explained this in an email dated I think on or

3    before November 14 to opposing counsel.  We were -- we tried

4    to extract the information, but there was no -- well, we were

5    able to extract some information.  We weren't able to extract

6    any meaningful information that we could reconstitute in a

7    document, as a document.

8              And Doug, am I accurately stating this?

9              MR. TILLEY:  Yes.  In a nutshell, what our vendor

10   was able to mine was materials -- raw files, audio, pictures,

11   video like dancing cats and memes and stuff, that appeared to

12   have been sent or received via WeChat, but there was no

13   ability and no discernible data that would inform when, from

14   whom, to whom, or basically in what context any of those files

15   were sent.  And further said to have extracted all of those in

16   the vicinity of 22 to 23,000 such files, to extract those, we

17   were advised, would be a manual, laborious, expensive process,

18   and that would be prior to review.

19             And just for purposes of context -- you know, I

20   don't know the Court's familiarity or use of various chat

21   clients, but WeChat is not dissimilar from WhatsApp or Keychat

22   or, you know, AOL Instant Messenger to harken back the

23   good 'ol days, that it's just -- it's very commonly used.

24   There's an ability to send attachments.  And the fact that

25   someone over the period of, you know, however long Professor

1    Zhang was using WeChat, the fact that there are so many files

2    is completely unremarkable.  It is not evidence of anybody

3    sending or receiving anything they shouldn't have.  It's just,

4    you know, somebody effectively texting with friends, family,

5    colleagues, professional acquaintances, et cetera.

6           MR. HOPENFELD:  Exactly.  I want to emphasize that,

7    Your Honor, which is in Asia they use these -- they use

8    functions like WeChat, I mean, it's just like what people text

9    with.  It's like on like every little smartphone, every little

10   smiley face that people -- emoji and people send to you, it's

11   all that stuff.  Now, do people use it for substantive

12   communications?  Yes.  But the bottom line is that we weren't

13   able to get anything meaningful out of the WeChat stuff,

14   though we tried.

15          And Your Honor, we have an incentive to try because

16   we don't -- again, we're the ones accused of doing wrong here,

17   and we're trying as best as we can to lay the table open to

18   show the other side that we haven't done anything wrong.  So

19   we don't want to leave any inference that we're hiding

20   something someplace.  So we did our best with that.  And to my

21   knowledge nobody -- at least even Bonumose hasn't complained

22   about the WeChat files.  Now maybe they will some day, but

23   they haven't, okay?

24          THE COURT:  All right.  From the information that

25   your vendor extracted or wasn't able to extract, there's no

 1   indication of recipients of these --

 2            MR. HOPENFELD:  No.

 3            THE COURT:  -- communications, okay.

 4            MR. HOPENFELD:  No.

 5            MR. TILLEY:  That's correct, Your Honor, that's our

 6   understanding.  And we went around the horn -- I spent a

 7   significant amount of time on the phone with the vendor making

 8   sure that I was understanding that the facts are precisely as

 9   we just recited and Your Honor summarized in a better more

10   succinct way than we could.  So yes, that is -- that is the

11   bottom line.

12            THE COURT:  Okay.

13            MR. HOPENFELD:  So that's the third pot.

14            And then there's the final pot.  The final pot of

15   documents are documents that the United States government

16   imaged from the devices that had been confiscated from

17   Professor Zhang.  That is all his electronic devices.  His

18   computers, cell phones.  You know, I don't even know what all

19   of these devices are.  I do know that the government --

20   obviously, we don't have access to the actual devices

21   themselves.  The only thing the government has given us is

22   this about eight terabytes of data of the files that they used

23   to image all of that.

24            And as we explained in our briefing, Your Honor, we

25   got these eight terabytes of data and we went to our discovery

```
 1    vendor, and they basically told us it will be a couple hundred
 2    thousand dollars just to host this.  That is just to upload
 3    that and, you know, just get it ready.  This is before you
 4    even do anything like put production numbers on it or review
 5    it or put search terms to it or extract it.  It's going to be
 6    a couple of hundred thousand dollars.  So we -- we've looked
 7    at that and we have no practical way of making any use out of
 8    this information.  And on the other side we had Bonumose
 9    repeatedly asking for it.
10              Now, we can reason --
11              THE COURT:  Mr. Hopenfeld, are there -- what other,
12    you know, devices or what have you are represented in this
13    eight terabytes, and is there any way to break out particular
14    ones?  Have you --
15              MR. HOPENFELD:  No.
16              THE COURT:  Has Professor Zhang been able to say,
17    you know, there are certain things that are -- you know,
18    certain devices or programs that I would use to communicate
19    with Tianjin and others not?  I mean, any way to narrow this?
20              MR. HOPENFELD:  Not that I know of.
21              MR. TILLEY:  Yes.  Your Honor, in response to your
22    first question, there are several computers that were seized
23    and imaged.  There were several mobile devices.  There were
24    external hard drives, there were USB and other sort of like
25    portable storage devices.  And Professor Zhang was unable to
```

1   exclude that really any of them contained potentially

2   responsive information.  And, you know, certainly we --

3           Sorry, I thought I was going to sneeze.

4           MR. HOPENFELD:  Your Honor, what I don't know of,

5   and Doug, you can tell me if I'm wrong, I know of no way to

6   separate the material.  Like, for example, to -- basically to

7   go in there and say, oh, we're going to concentrate on just

8   his computer or concentrate on just his cell phone or

9   something like that, you're going to have to go in there and

10  you're going to have to essentially upload the files and do

11  all this hosting service.  I don't know how you could do that.

12  I know that the cost of doing any of that would be extremely

13  large.

14          We didn't get -- Doug, correct me if I am wrong.  I

15  don't believe we got like separate -- it's not like we got a

16  different disk for each device.  We got all the data sort

17  of -- we got all the data lumped into one giant thing.  And I

18  believe -- as you can even see from the declaration that was

19  submitted by Bonumose, there's a proprietary -- I believe what

20  the government does is they have a proprietary -- proprietary

21  software for extracting and encrypting and doing all the data.

22  So a lot of the data is going to be wrapped up in there.

23          Now, as we also explained in our briefing, we don't

24  think that there's anything really relevant or proportional in

25  here.  To the extent that there is anything relevant to

1    Tagatose, we believe that the other materials that we would
2    have produced are already going to have that.  But again, we
3    just wanted to end the issue.  So what we did is say look, we
4    can't -- there's no practical ways to pull this up.  Spend
5    $200,000, put production numbers, and just stamp it and review
6    it, that's just going to be half a million dollar enterprise.

7         So what we decided to do is essentially do what Rule
8    34 allows you to do, and which I have done many -- back to my
9    days at the Department of Justice.  We just simply basically
10   gave them an unlimited inspection right.  So we said here's
11   the disks.  You can go inspect them.  You can -- if you want
12   to do any pulling, you can pull.  So if you're a discovery
13   vendor, if Bonumose has a discovery vendor where it can find a
14   way to separate certain out of the stuff and pull it and
15   produce it and use it in this litigation, they can.  It's
16   actually prejudicial to us, because we can't use any of this
17   information unless we produce it with the production numbers.
18   But we can't extract it.  So if they can do it, more power to
19   them.

20        But what I think -- but what we would object to and
21   object very strongly to is the notion that we would have to
22   pay for this enterprise given its, A, very high unlikelihood
23   that it would yield to anything useful in the case, and, B,
24   there's a simple way for plaintiffs to solve the problem.
25   They can do it themselves, and they have a strong -- if they

```
1    can find a way to economically extract the information, let
2    them do it.
3              THE COURT:  All right.  Let me -- Mr. Stidham, let
4    me hear from you on these three different groups.  And why
5    don't we take them in order starting with the 88,000 pages and
6    what that looks like to you.
7              MR. STIDHAM:  I'm sorry, Your Honor.  You cut out a
8    little bit.  Your question was with regard to the 88 --
9              THE COURT:  Sure.  What -- yeah.  What was that --
10   what was that information -- you know, do you think it's --
11   from what you've seen, is it -- you know, is it responsive and
12   so forth?
13             MR. STIDHAM:  Well, Your Honor, I mean, so we did
14   receive some documents.  They look to be responsive, yes.  I
15   mean, for I think the reasons the Court properly framed what
16   we're discussing today, we don't know whether that's all of
17   what's responsive.  We haven't, to be honest, been able to
18   spend the time yet to see whether or not, for example, there's
19   missing emails that might be connected, you know, what I think
20   we call -- when we're searching eDiscovery an orphan, you've
21   got an email that doesn't seem to have the related email
22   connected.  And to be honest, if one of the things that --
23   we've held off on some of that until we know and get a better
24   sense as to what the supplemental production is so that we
25   don't end up reviewing the same documents twice that may not
```

1    be connected to all the related strings.

2              So that's a long way to say, Your Honor, what we do

3    know is that, yes, some documents that are responsive and we

4    believe should have been provided before have been provided

5    since the Court's order.

6              THE COURT:  All right.  How about -- how about on

7    the WeChat?  You know, do you see some way that can be

8    meaningfully processed when it sounds like the vendor isn't

9    able to tell, you know, who received the communication, who

10   sent the communication?

11             MR. STIDHAM:  So Your Honor, I think this is

12   combined with kind of a broader question.  I did -- to our

13   understanding, the only information -- and Mr. -- I know both

14   of them are discussing this, so I guess I'm not sure which one

15   would address this, but I did not hear from them as to whether

16   or not they are talking about work they did on the actual

17   devices or whether they are talking about the mirrored image

18   that they sent to us.  Because our vendor has told us it's

19   kind of a different ball game, Your Honor.

20             Focusing just on the WeChat, we do understand that

21   you can access WeChat information on the device.  It's not

22   accessible in a meaningful way for the reasons we've kind of

23   articulated based on just the mirrored image that we received.

24   I think we're talking about a different ball game if you're

25   using the actual document themselves and then to the extent

1    there's access to WeChat information that has either been

2    saved to the cloud or somewhere else.  That's a question for

3    Professor Zhang and, to be honest, going to be part, I'm sure,

4    of the custodial deposition as to how he stored that.

5          So, Your Honor, we understand it can be meaningfully

6    accessed based on what was provided to us through the mirrored

7    image.  We do understand that it can be accessed through the

8    devices themselves and again with a better understanding as to

9    how Professor Zhang actually used these -- used that platform.

10   It's potentially accessible in that way.

11         THE COURT:  Okay.  And Mr. Hopenfeld, as to the

12   WeChat, do you have the devices that that was on or access to

13   cloud information?

14         MR. HOPENFELD:  Doug, you can probably help me out

15   here.  My understanding is that we searched for cloud

16   information -- go ahead, Doug.

17         MR. TILLEY:  Yeah, I'll take it.  So A, we do not

18   have access to the devices.  They remain in the custody of the

19   federal government.  So, you know, just to eliminate an

20   ambiguity in that regard, no, we have not run any searches on

21   the devices.  We have -- I mean, I have never seen the

22   devices.  I don't know that I ever will.  Hopefully some day

23   Professor Zhang can get his stuff back.

24         With respect to the cloud, we asked our vendor to

25   try to ascertain whether and to what extent any information

1    could be recovered that way. They reported that no, no it

2    cannot. That's just not the way WeChat works. And I will

3    represent to Your Honor that I separately have -- I have

4    personally sought to recover stuff from the WeChat cloud just

5    to assure myself that, you know, we were doing everything

6    within our power, because I know that that is an area of

7    particular concern for Bonumose, and I was not able to recover

8    anything.

9          I think that's fully responsive, but if there's

10   anything further that Your Honor would like to know I'm happy

11   to answer to the best of my ability.

12         THE COURT: Okay. All right. Mr. Stidham, on the

13   cloud, is that -- you have different information that -- from

14   a vendor that WeChat information can be accessed from the

15   cloud?

16         MR. STIDHAM: We do have different information, Your

17   Honor. And I also want to make clear that, you know, it's a

18   combination of whether you can access it from the cloud and

19   also how Professor Zhang was using it. I mean, we have the

20   one example relating to Chengdu contract that Professor Zhang

21   was saving in some way in the WeChat communications. And

22   we've got a indication that he was using WeChat to communicate

23   with Tianjin on obviously business-related matters. So

24   there's an additional question that's kind of not explained

25   with regard to that.

1          And Your Honor, if -- Mr. Tilley's statements not

2     having the devices I think to us raises something that's

3     pretty -- that might -- that should be a step that we believe

4     should be taken to expedite things.  And Your Honor, maybe an

5     order from this Court would be helpful in that regard.  But if

6     these devices -- these devices clearly exist, there's really

7     no reason given where the criminal case is, particularly if we

8     had a stipulation from the parties here that we'd like to have

9     access to these devices so that they can be appropriately

10    searched, you know, that avoids a lot of -- a lot of things

11    right there and runs to ground things quickly.  Because I

12    think to our understanding from our vendors it's a completely

13    different ball game when we're talking about the devices

14    themselves and what we can access and the efficiencies that

15    can be achieved in review.

16          MR. HOPENFELD:  Your Honor, can I speak to that

17    briefly?

18          THE COURT:  Yes.

19          MR. HOPENFELD:  So you'll recall, Your Honor, that

20    we did move for -- to the criminal case to release the

21    protective order --

22          CONFERENCE CENTER:  Your host is exiting the

23    conference.

24          (Brief interruption.)

25          THE COURT:  Counsel, I think I dropped you.

1          MR. HOPENFELD:  Your Honor, are you back on?

2          THE COURT:  I am.  Mr. Hopenfeld, you were just

3     starting to explain the criminal -- something going on --

4          MR. HOPENFELD:  Yeah.  So you'll recall that, you

5     know, once the devices are seized Professor Zhang doesn't have

6     access to them and there's a protective order.  And you'll

7     also recall that we repeatedly went back to the Court to try

8     to lift the protective order so that we could get our hands on

9     the devices, and all we got was the limited release from that

10    protective, as Your Honor knows, and we have made as much use

11    of that as we possibly can.  We're arguably pushing it if you

12    look at the scope of what the limitation on the protective

13    order is.

14          But the bottom line remains that we don't have

15    possession of those devices.  And we'd love to have possession

16    of those devices for a number of reasons, but we simply do

17    not.

18          THE COURT:  You know, I have a feeling that the

19    answer on that would -- for request to get access to the

20    devices themselves would be a resounding no.  You know, I --

21    if they -- if the devices are evidence or, you know, have

22    fruits of allegedly illegal conduct there's -- I don't think

23    there's any chance that the U.S. attorney's office or the law

24    enforcement agencies who may have custody of those devices are

25    going to be willing to have anyone else --

1        MR. HOPENFELD:  Your Honor, that is our information

2    as well.  That is my understanding from our criminal counsel,

3    is that it's -- it's highly unlikely that the U.S. attorneys

4    would comply there.

5        What I suggest to Bonumose is if they -- if this

6    is -- if this is that urgent to them, they should go -- I

7    mean, they have a relationship with the U.S. attorney.  I --

8    there's nothing that stops them from going and trying to

9    subpoena the U.S. attorney or ask the U.S. attorney

10   themselves.  They can do that.  But we have exhausted -- we

11   have exhausted our ability to get our hands on the devices for

12   now.

13       THE COURT:  Mr. Stidham, if there's -- if you make a

14   request to the U.S. attorney or any of the law enforcement

15   agencies and they are willing to release the devices, and

16   under some circumstances, you know, I'll certainly be -- you

17   know, open to considering that and figuring out a way to do

18   it.

19       MR. STIDHAM:  Your Honor, we will -- go ahead, Jack.

20       MR. MARTIN:  Your Honor, this is Jack Martin with

21   Hunton Andrews Kurth.  I do have a call in to Assistant U.S.

22   Attorney Pfleger on this very issue.  Unfortunately, I got his

23   voicemail and I think probably he's not working because of the

24   government shutdown.

25       THE COURT:  They are working.

1          MR. MARTIN:  Excuse me?

2          THE COURT:  Yeah, they are working.

3          MR. MARTIN:  Oh.  Well, he hasn't returned my call.

4   I'll try again then.  But let me just leave it here, Your

5   Honor.  I will -- I will make inquiries of Mr. Pfleger, but I

6   do think there's -- there's some likelihood that it's

7   something that the Court might be able to help us with.  I can

8   report back to the Court on the government's position.

9          But it seems to me that we had a pending civil case

10  and we had devices with relevant information that were seized

11  by the government.  It just seems to me that we -- we ought to

12  be able to work out some way to satisfy the government's

13  interest in preserving the evidence and the legitimate

14  interests of the civil litigants in having access to it.

15         And so again, I'll just leave it with -- we'll be

16  back in touch with the Court, but it may be a situation where

17  a court order would help us.

18         THE COURT:  And you can certainly explore -- explore

19  that and report back if there's something that you think can

20  be done.

21         MR. MARTIN:  And thank you for letting me know they

22  are in the office.  I'll try again.

23         MR. TILLEY:  Your Honor, I think that this is

24  contemplated by what you just said, but just because I like

25  beating horses good and dead, before --

1        Let's assume that the U.S. attorney's office is
2   willing to release the devices.  Before that happens, I would
3   ask that we all caucus and talk about how that's going to be
4   done.  What I'm concerned about is, you know, there's going to
5   be -- take for example, Professor Zhang's phone.  There's
6   going to be, you know, texts with his wife, texts or messages
7   potentially with counsel and stuff of a --
8        MR. STIDHAM:  Doug, at the risk of interrupting you,
9   I would just say that we would not want to take control of any
10  device without all parties being aware of it and the Court
11  understanding that, too.
12       MR. TILLEY:  Okay.
13       MR. STIDHAM:  I didn't mean to cut you off, Doug.  I
14  just wanted to say that --
15       MR. TILLEY:  No, that short-circuits it.
16       THE COURT:  Yeah, I'm sure there would have -- I'm
17  sure there would have to be some order associated with the
18  devices being released if they are going to be, so...
19       MR. TILLEY:  Just trying to err on the side of
20  clarity, but thank you.  Thank you both for that confirmation.
21       MR. STIDHAM:  And Your Honor, the only last thing
22  about WeChat, to clarify, is I do want to make it clear that
23  we do understand that there's a functionality in WeChat that
24  can be exploited not -- it's not just a question of preserving
25  it to other online platforms.  There's a function in WeChat

1    that allows a party to -- to save their WeChat messages such

2    that they would be accessible.  And so we would want to

3    have -- and maybe this is something that we have to explore in

4    a custodial deposition, but, you know, that's obviously a

5    question as to whether Professor Zhang was maintaining his

6    WeChat messages and whether or not there has been an effort by

7    the parties to using his password accessing whatever has been

8    saved within his WeChat account.

9            THE COURT:  Okay.  All right.  Well, it sounds like

10   any of the WeChat information, that's really something that

11   you'll just need to pick up at a later date, whether it's

12   after the deposition when you get some more information so

13   that you-all can look in the cloud or -- or, you know, if you

14   are able to get access to the devices.

15           And Mr. Tilley and Mr. Hopenfeld, of course if you

16   do get some information that you can access the WeChat

17   communications from the cloud and you think that there's some

18   reasonable way to search them, you know, I would encourage you

19   to reach out to counsel for Bonumose and talk about how to go

20   about that.

21           MR. HOPENFELD:  Your Honor, we will of course do

22   that.

23           THE COURT:  Mr. Stidham, how about on the -- any

24   more discussion on the six or eight terabytes of information

25   and how to deal with that?

1          MR. STIDHAM:  Well, Your Honor, I guess I'm

2    hesitating because, as this is framed, I guess perhaps it's a

3    question that we need to wait until the custodial depositions,

4    although we would certainly hope that the party would -- that

5    defense counsel would expedite things by taking steps now.

6          You know, what we set out is it's really not usable

7    for us, but we also don't have a certain password we would

8    need to even provide inefficient access to the documents.  And

9    part of our frustration with it -- I'm putting aside, you

10   know, the disputes as to how it was represented it was being

11   presented.  I know the Court is not looking at that.

12         But just the practical issues about this is we don't

13   know whether the government grabbed Professor Zhang's

14   children's devices and mapped them or not mapped them.  We

15   don't have any guidance regarding which ones were really used

16   by Professor Zhang or not so that we can engage in a

17   meaningful discovery.  And that's why we included some of the

18   dialogue between Mr. Ruff and Mr. Hopenfeld when we were

19   trying to get information regarding chain of custody how it

20   was used and we were getting stiff-armed.  So if we have to

21   wait for the custodial deposition, I guess we'll do that, but

22   I would just mark that there is a significant level of

23   frustration that -- among other things related to the document

24   dump that we've gotten no indication as to which one was the

25   device that Professor Zhang used when he was conducting

1  business.

2      THE COURT:  Yeah, and that's -- Mr. Hopenfeld,

3  that's what I was kind of trying to get at with some of my

4  questions to you, you know, about are there -- you know, were

5  there some computers or so forth that might contain responsive

6  documents or not.  And if you are able to get that

7  information, I think that certainly could -- could help just

8  to try and narrow the scope of what sounds like a really huge

9  amount of information that I'm sure contains lots of

10 unresponsive documents that there would be no need for anyone

11 to go through.

12     But if there are certain areas where Bonumose can

13 look, then, you know, that may prove helpful at some point.

14     MR. HOPENFELD:  Your Honor, let me -- at the risk of

15 as Doug would say beating the dead -- the horse is not dead.

16     I want to reiterate what was done before.  So when

17 we did our initial harvest of documents -- and I reiterate the

18 initial harvest of documents for the purpose of investigation,

19 it was way before any document requests came or discovery had

20 even started.  We basically got from Percival Zhang's computer

21 pretty much all of the files from CFB.  He basically -- we

22 went to him and said give us that, and he gave us pretty much

23 everything CFB had and a bunch of email accounts that he then

24 had.  So in terms of the relevant information to this case, it

25 should be there.

```
1              The only thing I don't know is -- the only
2     information where, to be candid, it's possible there's
3     information would be perhaps on the cell phone.  I just don't
4     know.  I'm not saying it is or isn't.  But that cell phone is
5     in the hands of the government.  So as far as I know, anything
6     that's going to be on those images is going to be either
7     repetitive, what's already produced with what has to do with
8     Tagatose or CFB, especially in light of the fact that we went
9     through the emails now in a separate way, or it's just going
10    to be stuff that's irrelevant.  But, obviously, we can't know
11    because we can't even -- we can't -- we don't have -- you
12    know, we didn't encrypt this device.  We didn't pull the -- we
13    didn't make the images, the government did.  So, you know,
14    there's a level to which I can't even answer the question.
15              THE COURT:  And so for the -- you said there was
16    some external hard drives and things like that.
17              MR. HOPENFELD:  USBs.
18              THE COURT:  Yeah.  Do you know if -- from what
19    Professor Zhang has told you whether any of that -- those
20    devices --
21              MR. HOPENFELD:  All I know -- so it could be --
22    there -- some of that information would be stuff that's --
23    there is some CFB information that we didn't collect, and a
24    lot of that is the information that if Your Honor would go
25    back and read the criminal trial, it's stuff like that.  So
```

1    for example, CFB's time sheets and stuff like that.  So I know
2    that there's stuff like that there.

3          But having to do with Tagatose and the technical
4    stuff and the stuff that's relevant to this case, there's no
5    indication that it -- that any of that would be there.
6    Otherwise I would have tried to collect it for purposes of
7    investigating the case and trying to figure out, you know,
8    what the merits of the case are.

9          Now, I can't -- I can't tell you under oath that
10   it's impossible that somewhere there is a relevant document in
11   there that somehow was on a USB device that Percival Zhang
12   didn't remember or think about.  It's possible.  But it is --

13          MR. TILLEY:  James, can I hop in or a second?

14          MR. HOPENFELD:  Yes, you can.

15          MR. TILLEY:  Yeah, sorry about that.

16          So certain -- in my understanding, certain of the
17   USBs, the external hard drives and some more voluminous
18   sources were things that might have been used -- and I sort of
19   emphasize because it's not clear, might have been used by
20   departed CFB personnel.  The fact is that all of this stuff
21   was in -- was in Professor Zhang's basement because CFB after
22   the events at issue in the complaint and our contentions about
23   Mr. Rogers taking steps to basically cripple the company, you
24   know, there was no money for office space.  There was no money
25   to keep any lights on, et cetera, et cetera.

1          So, you know, I want to be responsive to Your

2    Honor's question and I want to, you know, not impose on any

3    party any undue burden.  So it sounds like what you're asking

4    and what Mr. Stidham is asking, is it possible for us to give,

5    to provide a list of sources that definitely were not used for

6    purposes of any TIIB-related or CFB-related or otherwise

7    potentially relevant purposes.  And I'm not sure that it is

8    possible.

9          I will commit to you that we will ask Professor

10   Zhang if he can provide additional guidance.  We had that

11   discussion with him previously, and my recollection, which

12   isn't perfect, may -- my recollection is that he was not able

13   to say you definitely don't need to look at sources A, B, and

14   C.  But we will go back and ask in the hopes of avoiding

15   further disputes.  And while we disagree that we did a

16   document dump, rather, we gave what was asked for, you know,

17   we -- we're just trying to be reasonable and fair and not run

18   up the bills on anybody.  So that's something -- that's

19   something that we can do.

20          I don't want to commit -- as I sit -- well, more

21   accurately, as I pace here now -- that we're going to have a

22   way to materially limit the volume of potentially relevant

23   sources.

24          MR. HOPENFELD:  And just to add to that, Your Honor,

25   I suspect that the only way that we're going to be able to

```
1   definitively answer the question is when we actually get
2   access to the devices ourselves, just -- because there's no
3   other way we can double check right now without looking at the
4   devices themselves, oh, I don't -- yeah, that USB actually
5   does have some files.  I don't -- like I said, I think it's
6   highly unlikely given the nature of what we collected in the
7   first place, but we can't rule it out.
8           THE COURT:  And the passwords on -- on the
9   information that was imaged, is this -- is this passwords that
10  the government imposed or that their proprietary software
11  created or are these passwords that maybe Professor Zhang
12  placed on information?  Mr. Hopenfeld, do you know?
13          Mr. Stidham?  Could you tell from your review?
14          MR. STIDHAM:  To be honest, Your Honor, the
15  vendor -- I'm looking, and I don't recall whether the vendor
16  said that they were devices -- excuse me, passwords from
17  Professor Zhang related to his device or passwords related to
18  whoever imaged.
19          THE COURT:  All right.  I imagine --
20          MR. TILLEY:  Sitting here right now we do not have
21  that answer, either, on behalf of the defendant.
22          THE COURT:  If it's a password from the government,
23  I mean, they do -- you know, sometimes discovery that they --
24  the electronic discovery that they provide will have a
25  password really to get into the -- get access the information.
```

1    I don't think that there are multiple ones.  But that's

2    something that you could also ask the U.S. attorney.

3            MR. STIDHAM:  And Your Honor, we would ask, just

4    because we believe this should have been done before, that

5    Professor Zhang be -- that they discuss with Professor Zhang

6    the folder structure on the devices and if there are any

7    folders that likely -- excuse me.  Any folders that were used

8    in conducting business and those things, that has to be shared

9    with us because -- and I'm not sure whether they can or not.

10   But to the extent any of the folders can be identified as

11   relevant, that's something that should be done.  And then any

12   passwords that Professor Zhang possesses that are relevant to

13   this, we would like to have those, too.

14           MR. HOPENFELD:  Your Honor, let me -- may I

15   direct -- answer Mr. Stidham's question?

16           THE COURT:  Sure.

17           MR. HOPENFELD:  I would direct you to the original

18   document production we made, which includes basically the --

19   Professor Zhang maintained of his CFB folder structure with

20   all of the substantive documents in it.  And we produced that

21   as it was on his computer, which is again -- and the reason we

22   were able to do that is that we did -- that was information

23   that we did harvest prediscovery.  So you should already have

24   access to the main information, stuff that was on Percival's

25   computer.

1          MR. TILLEY:  Moreover, I have a vague recollection

2     that I would like not to be held to, but, you know, in the

3     spirit of transparency I want to share it.  I have a vague

4     recollection of the folder structure that Brett had asked

5     about.  I don't believe that that came from Percival or from

6     CFB.  I think that was a function of how the images were

7     created.  We -- we can go back and ask again.

8          You know, we're not in the business of frustrating

9     fair discovery.  We are just in the business of not taking on

10    disproportionate burdens for very marginal benefit.  So, you

11    know, we will work to the best of our ability to try, to the

12    extent we can, to narrow the scope of what Bonumose needs to

13    look at.  I am not committing that we will be successful in

14    doing so, because a lot of this depends on information and

15    facts that are not available to me, and, frankly, some

16    technical stuff that goes over my head.  But I will commit to

17    you, Your Honor, and to you, Mr. Stidham, that -- that we will

18    help to the extent that we're able.

19         THE COURT:  All right.  I certainly think -- go

20    ahead.

21         MR. STIDHAM:  I apologize, Your Honor.  Just while

22    Doug was speaking, Brett did inform me that the vendor

23    indicated that there's -- professor Zhang's Apple passwords

24    would be needed to access some information.  So Doug, if you

25    could see what you could do in that regard.  That's not the

1    only password, Your Honor, but those are passwords that are

2    relevant to review what was -- what was provided.

3            MR. TILLEY:  It may be productive, Erik, if you are

4    able to provide us with a list of the things that you

5    understand to be password protected.  And if your vendor was

6    able to determine whether -- you know, to determine or

7    suspect, I guess, whether those passwords were imposed by

8    Professor Zhang or by the government, that will help drive

9    that discussion.  I just want to note so there's no surprise

10   about it later.  I feel a little bit uncomfortable providing

11   passwords if -- you know, I shouldn't be saying this on the

12   record, but I use the same password for a lot of things, and

13   so, you know, that presents some sort of security concern for

14   me if we share Percival's passwords, if that's what they are.

15   But, you know, we will work with you in good faith to find a

16   solution to that to the extent that we can.

17           MR. STIDHAM:  So Doug, Brett will give you a call,

18   Brett or Brandi will give you a call, and we'll do our best to

19   identify that.  We also have -- we can start further

20   discussion on folder structure to the extent we can and show

21   you what our vendor was able to provide us.

22           With regard to the passwords, I -- those are

23   legitimate concerns.  Leave it to you as to whether you want

24   to state those attorneys' eyes only and give them just to

25   Brandi or something like that and she could make sure they are

1    not shared with anyone.  But we'll do what we can to address

2    concerns like that.

3            MR. TILLEY:  Okay.  I'd ask just if you could put it

4    in a writing to me, because I'm going to be very difficult to

5    catch over the next couple of days and I don't want to be a

6    bottleneck if you're waiting to do it by phone.  It will also

7    just help me make sure, you know, my notes are not imperfect

8    and I don't miss something.  So if you could do it in writing,

9    I think I'd prefer that just for the sake of simplicity.

10           MR. STIDHAM:  Okay.  I'm sorry, Your Honor, I

11   interrupted.

12           THE COURT:  No, no.  This back and forth is helpful

13   and I think it advances things a bit.  Because the amount of

14   information that was provided, it's -- I mean, I agree with

15   CFB, this is just too much to -- you know, to go through

16   reasonably.  But, you know, I think -- and from Bonumose

17   it's -- you know, it's not usable and searchable in the form.

18   So I think that the exercise that you-all are engaging in now

19   to try and identify, you know, components of it that may be

20   responsive is helpful and is what we need to do.  And there's

21   probably going to be some additional follow up during

22   Professor Zhang's deposition that you-all need to -- I think

23   this is a good start.

24           All right.  Is that -- I think that pretty much

25   wraps up the document -- the document production, or the

1    discussions about the document production.  Is there anything

2    else we need to address there concerning -- concerning the

3    motion for compliance?

4             MR. STIDHAM:  Your Honor, I think the only thing --

5    and I don't know whether you meant at the outset when you laid

6    the parameters whether you were including our request for a

7    modification of your order delaying the custodial deposition,

8    because just -- if you would just clarify.  I mean, we do

9    believe that that should proceed.  I don't want to jump into

10   argument on it, though, if this is part of what you're

11   referring to as not wanting to modify in the order.  So I --

12            THE COURT:  Well, you know, I think -- I think that

13   the reasons for delaying that still exist.  If there are, you

14   know, some legitimate Fifth Amendment considerations in there,

15   I suppose there could be, and I think that was discussed at

16   our -- at our last hearing.  You know, it's -- I think it's

17   out of Professor Zhang's control and really any of the parties

18   about when Judge Urbanski can issue his findings of fact and

19   conclusions of law and make a determination on the criminal

20   trial, and I'm sure Judge Urbanski, you know, is trying to be

21   very careful in that finding.  So -- but I think the reasons

22   for putting off the custodial deposition still -- I think they

23   still stand.  I do understand that it's -- it's putting, you

24   know, pressure on the -- on the case schedule, though.

25            MR. STIDHAM:  Thank you, Your Honor.  That's the

1    issue that I was unclear as to whether you wanted to hear

2    argument on that was remaining.

3            THE COURT:  If there's anything -- if there's

4    anything else that you-all wanted to -- that you think would

5    be helpful to -- you know, to address on that, I'm happy to

6    hear from you both, but --

7            MR. STIDHAM:  On the issue of the deposition, Your

8    Honor, or --

9            THE COURT:  On the -- yeah, on the deposition.  I'm

10   not sure that there's much we can do about it at this point,

11   though.

12           MR. STIDHAM:  Well, I just -- the only thing I'll

13   add, and I'll be brief in the hope that we can just be brief,

14   is that we -- we have not seen or believe there is a Fifth

15   Amendment concern that has been articulated with regard to the

16   custodial deposition.  You could certainly claim the Fifth

17   Amendment if somehow it was perceived a custodial deposition.

18           And while I do understand that we could move orders

19   out and things like that, there's a -- I don't want to go

20   against my promise to be brief, Your Honor.  It's just we do

21   think that we could -- we'd love to get that taken out of the

22   way so that we can take, as discussed last time, the time to

23   get the appropriate information together so we can have the

24   30(b)(6) and the other depositions move forward.  And that's

25   just reiterating our belief that there's not a legitimate

1    Fifth Amendment concern or basis to delay just the custodial

2    deposition.

3            THE COURT: All right. Mr. -- yeah, Mr. Hopenfeld,

4    is there -- sure, I do want you to respond. And let me just

5    ask you, you know, this question, or --

6            Are there some topics in the custodial deposition

7    that you think can go forward now and if there are Fifth

8    Amendment concerns you can raise them in the deposition and

9    then -- there's going to be -- there's going to be another --

10   you know, a subsequent deposition of Professor Zhang. Does it

11   make sense to go forward with some of the custodial deposition

12   and see if there is any need to raise a privilege objection?

13           MR. HOPENFELD: The answer is no, Your Honor. I

14   think I've -- we've addressed this several times in previous

15   iterations of this. I've spoken with my criminal counsel and

16   I can -- it's highly unlikely that there would be anything

17   meaningful. There's just too many ways to overlap. We can't

18   risk something going on while the verdict is pending. We

19   think that there's a certain strategy involved by Bonumose

20   with respect to this, which I won't go into. But -- or I will

21   go into if you really want me to tell you. But the answer is

22   that it won't be a meaningful deposition.

23           And the real important thing that I think is

24   important for Your Honor to understand is there's no prejudice

25   here because, as Your Honor knows, the trade -- the issue here

1    of trade secret, the patent application is published long ago.

2    The issue of damages is -- we don't even have a damages case

3    here.  It's not even about the damages.  So the only prejudice

4    would be the potential of if the discovery period is pushed

5    out, that's actually going to prejudice us, not them.

6         But as I explained in the briefing, it doesn't even

7    have to be pressed out because if the concern is that delaying

8    Professor Zhang's deposition further is going to delay

9    discovery, well, there's an easy solution.  Let us depose and

10   cross examine Dan Wichelecki and Ed Rogers so that we can

11   prove that the allegations against our client are false.  We

12   still haven't been able to do that.  They are not subject to a

13   criminal verdict.  So there's lots of solutions here.

14        The Fifth Amendment concerns have not gone away.  If

15   there is a deposition, criminal counsel is going to basically

16   instruct Professor Zhang not to answer a lot of questions.

17   Probably all of them.

18        THE COURT:  You know, I think that you-all can by

19   continuing to have discussions like what we were talking about

20   just a few minutes ago, Mr. Tilley and Mr. Stidham, to

21   identify certain areas where there may be responsive documents

22   and the images that were provided.  And I think that that can

23   start moving things along somewhat and then the deposition --

24   hopefully it will be in the next -- and you have 14 days from

25   whenever Judge Urbanski issues his ruling, so hopefully it

```
 1    will just be in the next, you know, few -- few weeks to a
 2    month that you can get that -- get that in and then follow up
 3    with the other -- you know, the subsequent depositions of
 4    Professor Zhang.  I think it makes sense to keep that order in
 5    place, though.
 6              MR. HOPENFELD:  Your Honor, with respect to keeping
 7    the order in place, that would include the fact that we can
 8    not depose Dan Wichelecki or Ed Rogers?
 9              THE COURT:  Well, that's up -- I mean, that's up to
10    you-all to talk about when -- when you want to have him --
11    have them deposed.
12              MR. HOPENFELD:  Well, we want to depose them as soon
13    as possible.  And the only barrier right now is --
14              MR. STIDHAM:  Your Honor, if I can to foreclose
15    this, is if they are not going to modify --
16              THE COURT:  Go ahead, Mr. Stidham.
17              MR. STIDHAM:  Yeah.  So, Your Honor, just -- I'm not
18    going to engage in an entire rearguing of why we ended up with
19    the order and the -- the order of depositions that we did
20    that's reflected in the Court's order.  We're not -- we do not
21    want that to be changed, and we understand the Court's ruling
22    with regard to continuing to delay the custodial depositions
23    and the subsequent depositions.  We just ask for the
24    modifications, for the reasons I articulated, to start that
25    now.  And the only thing I guess -- I sure hope that we're not
```

1      going to hear that it has to be delayed during the pendency of

2      an appeal or something like that, but with our fingers crossed

3      that we're not going to hear that the Fifth Amendment concerns

4      still exist after a verdict, we understand the Court's ruling

5      and we do not think it would be appropriate to modify any

6      other aspect, including the ordering of the other deposition.

7              THE COURT:  All right.  I think we can just keep --

8      I think we can keep those in place, and that's something that

9      you-all had -- we had reached an agreement on.

10             All right.  So I think that -- that takes care of

11     the motion -- all the topics in the motion to reconsider and

12     then also the motion to compel compliance; is that right?

13             MR. TILLEY:  I believe so, Your Honor.

14             MR. STIDHAM:  Bonumose believes so.

15             MR. TILLEY:  Motion to compel compliance as to

16     defendants.  There is the separate issue with respect to

17     Bonumose's compliance.

18             THE COURT:  Right, and then there's the CFB's motion

19     to compel concerning the communications with law enforcement.

20     So why don't we go ahead and move on to -- on to that one.

21             MR. TILLEY:  Before we do, Your Honor, and I'm sorry

22     to interrupt --

23             THE COURT:  Sure.

24             MR. TILLEY:  -- will there be -- we've talked about

25     a lot of stuff today already.  Will there be a written order

1    forthcoming, or is that something that you would like to defer

2    until you've received and taken a look through the

3    supplemental briefing that you described earlier?

4              THE COURT:  I'll probably do a pretty short order

5    for what we have talked about today, but as far as any real

6    substantive changes, I'm not sure that there's -- there's

7    been -- been much.  But I will do a --

8              MR. TILLEY:  That's fine.

9              THE COURT:  -- short written order today.  I think

10   the -- you know, the bigger issue is going to be after --

11   after the briefing, and I will do a written order on that.

12             MR. TILLEY:  Okay.  Thank you.  I was just -- I'm

13   trying to figure out, you know, what came next.  But that's

14   clear to me.  Thank you.

15             THE COURT:  All right.  On the motion -- CFB's

16   motion to compel.

17             MR. HOPENFELD:  Your Honor, this is Mr. Hopenfeld

18   again.  So the issue here -- there's a couple issues.

19             Obviously, this is the third time we've come to the

20   Court to get documents.  Now, there's a big difference between

21   what we're moving to compel on here and what we've seen

22   motions to compel coming from Bonumose.  Bonumose's motion to

23   compel are based on very broad requests asking for great

24   volumes of documents.  What we've asked for here is surgery,

25   and it's something that -- not only is surgery.  It is a very

1  limited set of documents.  It's a set of documents

2  that nobody has disputed are relevant in the prior two times

3  that we've addressed this issue with the Court.  And twice we

4  got orders from the Court to comply by a certain date and

5  twice we didn't.

6       And we also have -- we had a statement to this Court

7  by opposing counsel that all of the documents that is -- that

8  are responsive, which happen to be communications with law

9  enforcement, have been produced, and they were not produced.

10  And we didn't even find that out until we actually went to the

11  criminal trial and saw these additional documents from Ed

12  Rogers, because Ed Rogers's influence on the prosecution was

13  an issue in the criminal trial.

14       So we didn't want to make -- file a third motion, so

15  we went back to Bonumose with correspondence and saying

16  produce this stuff.  And they just would not produce the

17  information.  And information finally -- the information

18  finally was not produced until the day before they filed their

19  opposition.

20       Now, Your Honor --

21       THE COURT:  What was produced -- what was produced

22  in that final --

23       MR. HOPENFELD:  Additional communications with law

24  enforcement agencies, including a critical communication that

25  was dated July 1 -- 31, 2018.

 1          THE COURT:  So that's the one -- the email with the

 2    spreadsheet?

 3          MR. HOPENFELD:  Yeah, the email with the spreadsheet

 4    accusing Percival of dozens of crimes.

 5          THE COURT:  All right.  What were the other -- just

 6    the nature of the other ones?  Were there emails or other

 7    sorts of communications?

 8          MR. HOPENFELD:  There were emails, including

 9    communications --

10          MR. TILLEY:  There were emails --

11          MR. HOPENFELD:  Go ahead, Doug.  You can go ahead.

12          MR. TILLEY:  Yeah.  There -- there were emails

13    between Bonumose principals and Bonumose counsel with law

14    enforcement officials that were sent, you know, virtually all

15    of them a long time before we had the prior hearing in which

16    counsel represented to the Court unequivocally that everything

17    responsive had been produced.

18          There was one text message between Ed Rogers and I

19    believe an FBI agent -- or text thread, rather.  I think it

20    was more than one message.  There were no additional text

21    messages from anyone else, and as I -- if memory serves, no

22    representation that no additional, you know, such materials

23    existed.  But substantial volume of written materials, whether

24    text, email, attachments to emails, that was the nature of the

25    production, and we called out some of those materials in

1    our -- I believe in our reply brief as showing that, you know,

2    not only in the first instance was a member of Bonumose's

3    legal team in active communication on the very day that we

4    were told -- or in the very time period that we were told that

5    he was unavailable to interact with law enforcement, we saw at

6    least one communication that showed that he was in active

7    communication with law enforcement even earlier, and that was

8    right around the time of the July 17 deadline that was set in

9    the first instance.

10           So that was a rambling response, but that is the

11   nature of the production that came.  And also -- so that came

12   one business day -- after hours one business day prior to

13   filing of the opposition.  One hour on the day of the

14   opposition there was a supplemental interrogatory response

15   that disclosed a -- a not insignificant number of additional

16   oral communications that had occurred between representatives

17   of Bonumose and I believe Bonumose's principal, Mr. Rogers,

18   and members of law enforcement.  And those communications,

19   like the written ones, had occurred at least in part prior to

20   the time that Bonumose counsel represented to Your Honor that

21   everything responsive had been disclosed or produced.

22           THE COURT:  All right.  Mr. Stidham --

23           MR. HOPENFELD:  Your Honor --

24           THE COURT:  All right, Mr. Hopenfeld.  Is there

25   anything --

 1            MR. HOPENFELD:  There is other things -- issues with
 2    respect to the motion.  I want to make sure I can make my
 3    record, if it's okay.
 4            So in addition to -- so that answers the question of
 5    what was in there, but I think it's important for Your Honor
 6    to understand, is that we have never gotten an explanation as
 7    to why the false statement was made to the Court.  We had
 8    asked for an explanation and we've never given it.
 9            Now, one argument that you saw is, okay, well, we've
10    produced the documents.  Yeah, maybe we produced them at the
11    last minute, but the issue is moot.  We are very concerned
12    about this kind of discovery practice.  There's a name for
13    this kind of discovery practice.  It's called cheat and
14    retreat.  We mentioned that -- we used that specific words in
15    our briefing because that's what this is, and we're very
16    concerned about this.  Because it's not just this stuff, Your
17    Honor.  They are doing this with respect to other critical
18    documents.  Let me give you an important example.
19            So in a trade secret case like this, among the key
20    documents in every case are the laboratory notebooks of the
21    scientists with respect to the technology at issue.  We have
22    been asking email after email after email to get our hands on
23    those laboratory notebooks.
24            We finally had a meet and confer the other day where
25    we were given, yeah, okay, we'll produce the laboratory

1    notebooks.  But we still don't have those laboratory

2    notebooks.  And we're concerned, Your Honor, that if our

3    motion is denied that -- well, there's two concerns.  One is

4    that we've had to expend a tremendous amount of resource just

5    to get our hands on information that we should have had a long

6    time ago, and it's unfair to impose those costs on us.  But

7    we're especially concerned that if there's not a sufficient

8    deterrent effect here we're going to see this again.  We're

9    going to be back to the Court with more motions.  Or we're

10   going to get, you know, us having to spend weeks, months,

11   trying to drag important information out of Bonumose only to

12   have them cave at the last minute to avoid motion practice.

13          That is not the way discovery is supposed to work.

14   That's not the way we've worked.  And we really need some

15   clarity here so that Bonumose will play fair with us in

16   discovery, because right now they are not.  We don't even have

17   their laboratory notebooks.  This is over a year into the

18   case.  And there's other -- they haven't answered

19   interrogatories.  I mean, fundamental stuff.

20          THE COURT:  All right.

21          All right.  Mr. Stidham, especially focus on, you

22   know, why there was the production in November, why those

23   documents didn't come -- come earlier and then anything else

24   you'd like to say.

25          MR. STIDHAM:  Sure, Your Honor.  I mean, I -- I just

 1   refer the Court to the timeline that we set out in our

 2   response.  Your Honor, there was -- and I'd also like to have

 3   the Court take a look at what I actually said with regard to

 4   my understanding what was produced.  What is being represented

 5   is a false statement.

 6           There's a couple things at work, Your Honor.  The

 7   documents that were eventually produced in November, the ones

 8   the Court asked about, what those consisted of were copies of

 9   some emails between legal counsel and attachments that went to

10   the criminal counsel, some -- frequently in response to some

11   requests from the state were to provide the state documents.

12   And the documents and attachments included discovery and

13   protective order information relevant to this case.

14           And those were produced at a time, Your Honor, if

15   you kind of track things down, the parties -- it was raised I

16   think at that October 15 hearing that the parties were still

17   meeting and conferring regarding some of these.  And there's

18   two things:  One we were looking -- we did look to go see

19   whether we had gotten a complete copy of everything that

20   Mr. Heaphy might have sent or that was sent by others, but we

21   were also trying to address whether or not we needed to

22   provide documents that were send by legal counsel on behalf of

23   Bonumose to the state.  Because the way it had been responded

24   to previously related to communications from Mr. Rogers.

25           So what ends up getting produced in November, Your

1    Honor, is -- are the -- are some documents that reflect

2    attorney communications and attachments to criminal counsel.

3    I think there's one from me and there's some from Mr. Heaphy,

4    which include everything from Mr. Heaphy saying, you know, did

5    you have a good weekend, when are we going to be able to get

6    together and meet?  The only thing that -- and they were newly

7    discovered during the relevant time period, were some text

8    messages -- or newly identified by legal counsel were some

9    text messages from Mr. Rogers to one of the investigators.

10   And so we made the decision in November -- this is, to be

11   blunt, a stupid issue that's being manufactured by them for

12   the reasons that we laid out in our argument.  But let's just

13   give them all the attorney communications with criminal

14   counsel.

15          And we also did note, because they have not been

16   providing it with regard to Tianjin and others, we expect to

17   see now all counsel communications with the criminal -- with,

18   excuse me, the state regarding this investigation and

19   including communications between legal counsel and, you know,

20   Tianjin and their agents that, you know, are discoverable.

21          So Your Honor, we did not intend -- I'm sorry.

22          THE COURT:  Why is it in this July 31 email from

23   Mr. Heaphy to the AUSA -- you know, you're characterizing that

24   as an email from counsel, which -- or communication from

25   counsel, which it was, but the substance of it is that the

1    spreadsheet that Mr. Heaphy transmitted, I mean, that's -- the

2    real communication is the -- you know, the information that

3    Mr. Rogers put in the spreadsheet for the AUSA.  I mean, why

4    wasn't that provided earlier?

5            MR. STIDHAM:  Well, Your Honor, I do think that -- I

6    think our understanding was that potentially was part of an

7    oversight from me.  When I made that statement I did

8    understand that it had been produced.  And I think it was

9    categorized as communication between counsel and not

10   categorized.  So if the Court believes that that was an

11   improper distinction, oversight by us, I'll take that blame.

12           I would note -- and again, I'm not -- I meant what I

13   said that I'll take the blame on that if we had an oversight

14   with regard to that and producing it.  But it is not the case

15   that they did not have access.  There's been no indication

16   that they did not get all of this information.  And it was

17   affirmatively represented to us by the state and I have no

18   reason to believe that they didn't -- they didn't follow its

19   obligation.  That anything that they were asking for from us

20   and that we were providing to them or volunteering to them was

21   going to be provided to counsel for Mr. Zhang.

22           So I just want to make it clear that there's no

23   attempt to hide the ball or gamesmanship relating to hiding

24   the ball.  Everybody understood, and I don't think it's in

25   dispute that these -- this information was provided to the

```
 1   other side.
 2              MR. HOPENFELD:  Your Honor, may I respond to that?
 3              THE COURT:  And Mr. Stidham, just because you're
 4   saying it's provided to the other side but provided by the
 5   government?  Is that what --
 6              MR. STIDHAM:  Yeah, that's what I meant.
 7              MR. HOPENFELD:  Your Honor, I go back to the
 8   Virginia Tech emails.
 9              MR. STIDHAM:  James, can I --
10              THE COURT:  Hold on.  Mr. Hopenfeld, that point is
11   not lost on me, but let me -- let me let Mr. Stidham finish.
12              MR. HOPENFELD:  Sure.
13              MR. STIDHAM:  And Your Honor, I just thought this
14   was part of what you'd asked for in your question to me, too,
15   at the outset, and I just wanted to address that.
16         Mr. Tilley made some assertion regarding
17   representations about Mr. Heaphy's schedule.  I think we've
18   addressed that had in a couple different affidavits.  One,
19   there was no deadline with regard to the letter that they say
20   there was that was set to go out to counsel.  And the
21   representations regarding Mr. Heaphy's schedule was related to
22   his inability to take care of -- or identify the task of
23   getting those letters out to the appropriate counsel.
24         When he was continuing to be unavailable for that
25   particular task or oversight Mr. Hanbury took care of it.  And
```

1    that's what was indicated by me, that Mr. Heaphy had not been
2    available but we took care of it.  So I just want to make sure
3    that we understand what that issue is about regarding
4    representations regarding Mr. Heaphy's schedule.
5                THE COURT:  Okay.  You know, I was concerned about
6    that, but, you know, still I remain concerned about the
7    November production and, you know, why that -- why that wasn't
8    made earlier.  And, you know, it is -- and Mr. Hopenfeld, I
9    will give you an opportunity to talk in just a second.  But it
10   is a very narrow category of documents and -- or type of
11   documents, and I don't think that, you know, the same sort of
12   relief that I've put in in other orders about having custodial
13   deposition and so forth would at all be necessary or
14   appropriate given the nature of what -- what this information
15   is that you-all are seeking.  But I -- you know, I am
16   concerned that it wasn't turned over earlier and that did take
17   a number of orders to get it and then ultimately, you know, a
18   motion to compel prompted the supplemental discovery
19   production.
20               MR. TILLEY:  Well, Your Honor -- I'm sorry, go
21   ahead.
22               THE COURT:  Mr. Stidham, is there something that you
23   want to respond to that?  And then I'll turn --
24               MR. STIDHAM:  I just didn't know whether you were
25   asking for a question, Your Honor.  All I can tell you is

1    we've set it out.  We did make the determination, and I'd

2    encourage the Court to look at it, that after that motion to

3    compel that was filed we made the determination that we would

4    not fight the issue of communications with counsel.  And

5    that's what was produced in the last one, with the exception,

6    to my recollection, of those text messages which we identified

7    from Mr. Rogers.  And we did undergo serious effort both at

8    Hunton & Williams and at Holland & Hart to see whether we had

9    missed anything in prior productions.

10            THE COURT:  Okay.  All right, Mr. Hopenfeld.

11            MR. HOPENFELD:  Yeah, a couple things.  The first

12   thing I suspect Your Honor already knows.  The fact that the

13   government has provide -- may have provided -- and by the way,

14   I'm not sure that the government did provide all that

15   information to us in the criminal matter.  There's not -- I

16   can't really tell you whether that's true or not.

17            The fact that the government provides this

18   information has -- as Your Honor knows, is no excuse to not

19   provide it when you're asked for it.  I mean, we did not

20   contend, for example, after -- that the Virginia -- we didn't

21   need to provide our Virginia Tech emails simply on the ground

22   that Virginia Tech had already been subpoenaed them.  We could

23   have -- I mean, we --

24            THE COURT:  I agree with you on that, Mr. Hopenfeld.

25            MR. HOPENFELD:  There's a bigger picture here, okay?

1    So Your Honor issued a clear order.  Actually issued a clear

2    order twice.  The first time you ordered the plaintiffs to go

3    out and send these letters to -- to the law enforcement

4    agencies to give them a chance to object.  You gave them two

5    weeks to do it.  It's an easy letter to send.  They didn't do

6    that.  They spent over a month just to send those letters out.

7    I mean, to me that's -- right there that's outrageous.  Okay.

8    Took -- it took a little extra time, but you issued a clear

9    order, and you said fine, it's okay to let the deadline slide

10   a little bit.  Okay.

11        We come back and we say where are the

12   communications.  And Your Honor -- and we go and have another

13   motion.  And Your Honor asked very clear questions.  I invite

14   Your Honor to go back and read the transcript that -- I think

15   it's the August 31 hearing.  It was very clear what was at

16   stake here.  It was all the communications with the law

17   enforcement issues.  There was not -- it was not subset of

18   them.

19        The notion that when Mr. Stidham represented to you

20   that he was not talking about all the documents, he was

21   talking about some subset of them, it just doesn't make sense

22   based on the record, okay?

23        And Your Honor, if there was some unclarity as to

24   what your order was, I submit to you that the proper thing to

25   do would have been to have gone back to the Court and say hey,

1       look, we don't understand something.  We want to work it out.

2              That's what we have done with respect -- that's why

3       we came back to you with the motion for reconsideration on the

4       issue of the Tagatose indirectly related documents.  We did

5       not want to come across a court order.  We didn't want to be

6       in the position of just making a unilateral interpretation of

7       your order without giving Your Honor some sort of chance to

8       help us out so that we can make sure that we're all on the

9       same page.  That's how we approached the issue when there was

10      an issue with your order.

11             You didn't see that from the other side.  As a

12      matter of fact, we're hearing all this stuff for the first

13      time today what these excuses are, and quite frankly they

14      don't make any sense.  And the reason why we're so passionate

15      about this is we've had to spend a lot of money on something

16      very, very simple.  It's just not fair.

17             MR. STIDHAM:  Your Honor, I'm going to -- I'm going

18      to bite my tongue.  I'm pretty frustrated about a lot of

19      what's being represented, and I know the Court has legitimate

20      concerns, but I'll bite my tongue for now unless that -- well,

21      I'm not.

22             You know, we did -- Mr. Ruff did engage -- there's a

23      time sequence here that I think is relatively important.  It

24      was at I believe the October 15 hearing at the end that it was

25      identified that the parties were continuing to meet and confer

1    to address issues, one of which was this.

2        And then also what's being skipped over is these

3    folks did have, as we understand it, the Heaphy email that

4    included the spreadsheet, and Mr. Ruff was trying to engage

5    them during the relevant time period as what they were

6    contending was being missed.  There was a difference of

7    opinion and understanding regarding whether or not attorney

8    communications were going to be included.  There was no bad

9    faith act.  And the fact that they are doing exactly with what

10   we identified, Your Honor, as our concern with the timing of

11   this.

12        The Court set its October 30 order out that it

13   included some language that they took issue with regarding to

14   how they are conducting discovery, and so then they filed this

15   to try and comb issues we believe and create this issue.  And

16   then now we're listening and I've bit my tongue while

17   Mr. Hopenfeld has talked for hours now making assertions

18   regarding not only us, our motives and Mr. Rogers, and they

19   are trying to -- and then he's now asserting other issues that

20   are not before the Court regarding discovery ignoring the

21   issues that he knows are also subject to meet and confer that

22   we have regarding concerns about their issues.

23        And so Your Honor, I don't mean to be arrogant or

24   dismissive of what the Court has already identified as its

25   concern regarding timing, but I have to confess that I'm very

1    frustrated at how this is being I believe misrepresented and

2    is being used as some kind of tool to blunt what has been

3    framed to this Court about very legitimate concerns about what

4    is being withheld by the defendant.  So I apologize, Your

5    Honor, but I had a hard time biting my tongue.

6         THE COURT:  Well, Mr. Hopenfeld, it is your motion.

7    I'll give you the last -- the last word if you want to say

8    anything else on this one.

9         MR. HOPENFELD:  Your Honor, I think I've made pretty

10   clear what our position is here.  I don't know that there's --

11   it's going to be helpful for me to say much more than we just

12   want basic fairness here.  And we'll leave it to the Court to

13   determine whether you're not -- your questions to counsel were

14   clear and whether their answers were responsive, and we'll

15   leave it to the Court as to how it wants to go about making

16   sure that parties actually respond to court orders and comply

17   with them.  And then when they have a problem with that order,

18   an interpretation issue, how Your Honor wants parties to deal

19   with it.

20        All I can tell you is this has been an expensive one

21   for us.  It shouldn't be.

22        THE COURT:  All right.  On this motion to compel, it

23   is -- it does concern a discrete bit of information and there

24   were two orders concerning it.  It appears that -- that

25   Professor Zhang and CFB were at least given some of these

1    documents through other sources, which doesn't excuse the late

2    production, but I think it probably does to some degree

3    mitigate any prejudice that they may have suffered.

4         But, you know, my concern here is that it -- you

5    know, it means that Professor Zhang had to -- had to bring a

6    motion to compel to get what -- what now appears to be a full

7    production of relevant responsive documents.  You know, you

8    shouldn't have had to do that.  I think that -- you know, that

9    the example that has been held out, the July 31 email with the

10   spreadsheet, you know, it's certainly relevant.  It talks

11   about Tagatose and -- and that was information that was

12   created by -- by Ed Rogers, and it should have been provided

13   earlier.

14        So I do think that -- that the relief that is

15   appropriate for -- for this motion, it's -- I don't think

16   there's a need to compel any further production.  I think

17   Bonumose knows what its obligations are and has probably by

18   all accounts provided all responsive documents at this point.

19   But I do think that -- that some amount of attorney's fees is

20   appropriate for having to bring the motion to get that final

21   production.  It's a -- it really is I think a fairly simple

22   and straightforward issue, so I think the amount of attorney's

23   fees needs to -- needs to reflect that and needs to reflect

24   that just prior to the Bonumose's response to the motion to

25   compel that the -- that the rest of the responsive documents

1    were provided.

2          So what I'm going to do is order an award of

3    attorney's fees of -- and I think these are -- these will be

4    reasonable attorney's fees given the issue that was raised,

5    but attorney's fees of $2,000 that's directly related to

6    having to file the motion to get these responsive documents.

7    But I don't think that any further -- or any additional relief

8    is -- is necessary or appropriate.

9          MR. TILLEY:  Thank you, Your Honor.  This is Doug

10   Tilley.  I just want to highlight one -- one issue.  You know,

11   like James said, it's not clear that we -- that, you know,

12   Professor Zhang or his criminal counsel did receive these

13   materials, and I'm not going to quibble with that.  But what I

14   do want to make clear, and I think Your Honor has, but, again,

15   dead horse.  The suspicion or the belief or even the fact that

16   Professor Zhang may have received information from the

17   government, I -- I would like a clear declaration that that is

18   not a basis for Bonumose to withhold information.  There's --

19   you know --

20         THE COURT:  I think -- I think I've -- I think I've

21   said that.  I think I've said that twice, so I don't need

22   to --

23         MR. TILLEY:  Okay.

24         THE COURT:  -- clarify anything on that, Mr. Tilley.

25         MR. TILLEY:  Okay, great.  Thank you.

1          THE COURT:  All right.

2          MR. HOPENFELD:  Your Honor, I realize that you -- if

3     your amount of $2,000 is final, but I'd be willing to submit

4     my time sheets and Mr. Tilley's time sheets devoted to that

5     issue if that will help Your Honor.

6          THE COURT:  Well, I think that -- like I said, I

7     think that it has to be a reasonable award of attorney's fees,

8     and based on the -- really the -- you know, the nature of this

9     issue it's a -- it's a very discrete category of documents.

10    It was a -- you know, a subsequent production after documents

11    had been provided and interrogatories responded to initially

12    on it, and it -- it really is a simple issue.  So I -- you

13    know, I think that -- I think the $2,000 is reasonable to --

14    you know, to address it.

15          Counsel, I think that that addresses all three of

16    the motions, and I will issue a short written order on --

17    regarding the rulings of this hearing and then I will look for

18    your briefs next Friday, and I'll try and take up that issue

19    quickly.

20          MR. TILLEY:  Thank you, Your Honor.

21          MR. HOPENFELD:  Thank you, Your Honor.

22          MR. STIDHAM:  All right.

23          THE COURT:  Counsel, thank you all for calling in,

24    and have a nice weekend.

25          MR. HOPENFELD:  You have a nice weekend too, Your

1   Honor.

2           MR. TILLEY:  You as well, thank you.

3           MR. STIDHAM:  Thank you, Your Honor.

4   (The proceedings concluded at 3:26 p.m.)

5                   CERTIFICATE

6           I, Mary J. Butenschoen, certify that the foregoing

7   is a correct transcript from the record of proceedings in the

8   above-entitled matter.

9   /S/ Mary J. Butenschoen                    2/7/2019

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25